## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| IN RE: GENERIC PHARMACEUTICALS PRICING ANTITRUST LITIGATION<br><br>_____<br><br>IN RE: FLUOCINONIDE CASES<br><br>_____<br><br>THIS DOCUMENT RELATES TO:<br><br>*ALL INDIRECT RESELLER PLAINTIFF ACTIONS* | MDL No. 2724<br>No.  16-MD-2724-CMR<br>HON. CYNTHIA M. RUFE<br><br><br><br>16-FL-27243<br><br>Civil Case No. 17-cv-3818<br><br>**CLASS ACTION**<br>**JURY TRIAL DEMANDED** |

## INDIRECT RESELLER PLAINTIFFS'
## AMENDED CLASS ACTION COMPLAINT

## TABLE OF CONTENTS

**PAGE**

I.     NATURE OF THE ACTION .................................................................. 1

II.    ONGOING INVESTIGATIONS .......................................................... 3

III.   THE ROLE OF INDEPENDENT PHARMACIES ........................... 9

IV.    JURISDICTION AND VENUE ......................................................... 10

V.     PARTIES ............................................................................................. 11

    A.   Plaintiffs ...................................................................................... 11

    B.   Defendants ................................................................................... 12

VI.    INTERSTATE COMMERCE ............................................................ 14

VII.   THE GENERIC FLUOCINONIDE CONSPIRACY ........................ 14

    A.   The Fluocinonide Market ........................................................... 14

    B.   Defendants increased the price of Fluocinonide ........................ 16

    C.   As part of the conspiracy, some Defendants increased their WAC benchmarks in lockstep ............................................................................................... 29

    D.   No shortages or other market changes can justify Defendants' price increases ...... 32

    E.   Defendants acknowledge the lack of generic drug competition .............................. 33

    F.   Defendants had many opportunities to conspire on Fluocinonide .......................... 34

    G.   Defendants' concerted efforts to increase prices for generic Fluocinonide yielded supracompetitive profits ...................................................................................... 46

    H.   The Fluocinonide market is susceptible to collusion .............................................. 47

        1.   Industry concentration ........................................................ 47

        2.   Barriers to entry ................................................................. 49

        3.   Inelastic demand ................................................................ 50

        4.   Lack of substitutes ............................................................. 52

        5.   Standardized product .......................................................... 53

        6.   Inter-competitor contacts and communications ................. 54

VIII.  THE STATUTES OF LIMITATIONS DO NOT BAR PLAINTIFFS' CLAIMS .............. 60

    A.   The statutes of limitations did not begin to run because Plaintiffs did not and could not discover Defendants' unlawful conspiracy ........................................................ 60

i

    B.    Active concealment tolled the statutes of limitations ................................ 61

        1.    Active concealment of the conspiracy ......................................... 62

        2.    Plaintiffs exercised reasonable diligence .................................... 63

IX.   CONTINUING VIOLATIONS ........................................................................ 64

X.    DEFENDANTS' ANTITRUST VIOLATIONS................................................ 64

XI.   CLASS ACTION ALLEGATIONS .................................................................. 66

XII.  CAUSES OF ACTION ..................................................................................... 70

XIII. PRAYER FOR RELIEF................................................................................... 115

XIV. JURY DEMAND ............................................................................................. 117

**FILED WITH REDACTIONS – PUBLIC VERSION**

## I.   NATURE OF THE ACTION

1.      This action brings claims on behalf of pharmacies ("Indirect Reseller Plaintiffs," "independent pharmacies," or "Plaintiffs") for injunctive relief and to recoup overcharges that resulted from an unlawful agreement among Defendants to allocate customers, rig bids, and fix, raise and/or stabilize the prices of generic versions of the prescription drug Fluocinonide : (1) topical cream 0.05%; (2) topical emulsified base cream 0.05%, (3) topical ointment 0.05% and (4) topical gel 0.05% (collectively "Fluocinonide ").[1]

2.      Fluocinonide is a topical corticosteroid used for the treatment of a variety of skin conditions, including eczema, dermatitis, and psoriasis.  It is widely prescribed in the United States.

3.      For many years, competition among the small group of sellers of Fluocinonide kept prices stable, at low levels.  But starting in June 2014, Defendants, who dominate the market for Fluocinonide, abruptly and raised their respective Fluocinonide prices.  During the summer of 2014, prices of Fluocinonide increased by an average of 163%, and in some instances by more than 241%, and prices remain at supracompetitive levels today.

4.      Defendants' unlawful and anticompetitive conduct in the Fluocinonide markets is part of a larger conspiracy or series of conspiracies involving numerous generic pharmaceuticals and pharmaceutical manufacturers.

5.      The price increases imposed by Defendant manufacturers of Fluocinonide cannot be explained by supply shortages or any other market feature or shock.  Nor were they the result

---

[1] In addition to the above-referenced formulations, Fluocinonide is also sold in 0.1% cream and solution formulations.  "Fluocinonide " as used in this complaint refers only to the 0.05% cream, emulsified base cream, ointment, and gel formulations at issue in this action.

of unilateral business decisions.  Instead, the significant increases in the prices of Fluocinonide were the result of an illegal agreement among Defendants to fix prices.

6.      As alleged below, Defendants arranged their conspiracy partly through in-person meetings at trade association events, which allowed them to actively conceal their agreements from paper or electronic records.

7.      Extreme and unprecedented price increases in the generic drug industry—like those imposed by manufacturers of Fluocinonide —have prompted close scrutiny of the industry by the U.S. Congress, federal and state enforcement agencies, and private litigants.

8.      An ongoing criminal investigation by the Antitrust Division of the U.S. Department of Justice ("DOJ") has, to date, resulted in price-fixing guilty pleas from two senior executives at Heritage Pharmaceuticals, Inc. relating to the sale of doxycycline hyclate and glyburide.  But DOJ has made clear that its "investigation is ongoing"[2] and the evidence uncovered during the course of its investigation into those drugs also "implicates…a significant number of the Defendants…[and] a significant number of the drugs at issue" in this Multidistrict Litigation.[3]

9.      The Attorney General for the State of Connecticut ("Connecticut AG"), whose office has been pursuing an investigation of antitrust violations in the generic drug industry, confirms that there is "compelling evidence of collusion and anticompetitive conduct across many companies that manufacture and market generic drugs in the United States . . . [and] evidence of widespread participation in illegal conspiracies across the generic drug industry."[4]

---

[2] DOJ, Division Update Spring 2017 (Mar. 28, 2017), *available at* https://www.justice.gov/atr/division-operations/division-update-spring-2017/division-secures-individual-and-corporate-guilty-pleas-collusion-industries-where-products

[3] Intervenor United States' Motion to Stay Discovery at 1-2 (May 1, 2017) (ECF No. 279).

[4] Connecticut AG, Press Release (Dec. 15, 2016) *available at* http://www.ct.gov/ag/cwp/view.asp?Q=588538&A=2341

**FILED WITH REDACTIONS – PUBLIC VERSION**

10.    Manufacturers of generic Fluocinonide are implicated in these ongoing investigations; all of the Defendants named here—Actavis Holdco U.S., Inc., Teva Pharmaceuticals USA, Inc., and Taro Pharmaceuticals USA, Inc.—have received a federal grand jury subpoena and/or an investigative demand from the Connecticut AG as part of the generic drug price-fixing investigations.

11.    Plaintiffs have paid millions of dollars more than they would have in competitive markets for Fluocinonide.

12.    Plaintiffs bring this action against Defendants on account of their past and ongoing violations of Sections 1 and 3 of the Sherman Act (15 U.S.C. §§ 1, 3) and the state laws set forth below.  Plaintiffs bring this action both individually and on behalf of (a) a national injunctive class of all privately held pharmacies in the United States and its territories that purchased generic Fluocinonide products manufactured by any Defendant, from June 1, 2014 to the present ("Class Period"), and (b) a damages class of all privately-held pharmacies in certain states that purchased generic Fluocinonide products manufactured by any Defendant, from June 1, 2014 to the present.

## II.    ONGOING INVESTIGATIONS

13.    Now in its third year, the federal criminal investigation into generic drug price-fixing has begun to bear fruit. On December 12 and 13, 2016, DOJ filed criminal charges against former Heritage executives Jeffrey Glazer (CEO) and Jason Malek (President). The government alleged that they conspired with others "to allocate customers, rig bids, and fix and maintain prices" of glyburide and doxycycline hyclate in violation of the Sherman Act (15 U.S.C. § 1).[5]

---

[5] Information ¶ 6, United States v. Glazer, No. 2:16-cr-00506-RBS (E.D. Pa. Dec. 12, 2016) (ECF No. 1); Information ¶ 6, United States v. Malek, No. 2:16-cr-00508-RBS (E.D. Pa. Dec. 13, 2016) (ECF No. 1).

**FILED WITH REDACTIONS – PUBLIC VERSION**

14.    On January 9, 2017, Glazer and Malek pleaded guilty to those charges.[6]   Deputy Assistant Attorney General Brent Snyder of the Justice Department's Antitrust Division explained: "These charges are an important step in correcting that injustice and in ensuring that generic pharmaceutical companies compete vigorously to provide these essential products at a price set by the market, not by collusion."[7]   As they await sentencing, Glazer and Malek are cooperating with DOJ's continuing investigation.   More criminal charges and guilty pleas are expected to follow.[8]

15.    Although initial public disclosures suggested that the federal and state investigations were focused on one or two drugs, it is now clear that both investigations are much, much broader.   The investigations reportedly cover two dozen drugs and more than a dozen manufacturers.[9]   Press reports indicate that "[t]he Department of Justice (DoJ) believes price-fixing between makers of generic pharmaceuticals is widespread."[10]

16.    According to one report, prosecutors see the investigation of the generic drug industry much like DOJ's antitrust probe of the auto parts industry, which has morphed into DOJ's largest criminal antitrust probe ever.   *See In re Automotive Parts Antitrust Litig.*, No. 2:12-md-

---

[6] *See* Tr. of Plea Hearing, *United States v. Glazer*, No. 2:16-cr-00506-RBS (E.D. Pa. Jan. 9, 2017) (ECF No. 24); *see also* Tr. of Plea Hearing, *United States v. Malek*, No. 2:16-cr-00508-RBS (E.D. Pa. Jan. 9, 2017) (ECF No. 24).

[7] DOJ Press Release (Dec. 14, 2016) *available at* https://www.justice.gov/opa/pr/former-top-generic-pharmaceutical-executives-charged-price-fixing-bid-rigging-and-customer

[8] *See, e.g.,* Eric Kroh, "Generic Drug Price-Fixing Suits Just Tip Of The Iceberg," Law360 (Jan. 6, 2017) ("'Once somebody starts cooperating, it leads to many more indictments.'"), *available at* https://www.law360.com/articles/877707/generic-drug-price-fixing-suits-just-tip-of-the-iceberg

[9] David McLaughlin & Caroline Chen, "U.S. Charges in Generic-Drug Probe to Be Filed by Year-End," Bloomberg (Nov. 3, 2016) *available at* http://www.bloomberg.com/news/articles/2016-11-03/u-s-charges-in-generic-drug-probe-said-to-be-filed-by-year-end

[10] PaRR Report, "DoJ Believes Collusion over Generic Drug Prices Widespread" (June 26, 2015) ("PaRR Report"), *available at* http://www.mergermarket.com/pdf/DoJ-Collusion-Generic-Drug-Prices-2015.pdf

**FILED WITH REDACTIONS – PUBLIC VERSION**

02311 (E.D. Mich.).  As in that case, prosecutors expect "to move from one drug to another in a similar cascading fashion."[11]

17.     DOJ and a federal grand jury empaneled in the Eastern District of Pennsylvania have focused on at least sixteen generic drug manufacturers as part of the growing investigation, including: Actavis Holdco U.S., Inc. ("Actavis"); Aurobindo Pharma USA, Inc. ("Aurobindo"); Citron Pharma LLC ("Citron"); Dr. Reddy's Laboratories, Inc. ("Dr. Reddy's"); Heritage Pharmaceuticals, Inc. ("Heritage"); Impax Laboratories, Inc. ("Impax"); Lannett Company, Inc. ("Lannett"); Mayne Pharma, Inc. ("Mayne"); Mylan Inc. ("Mylan"); Par Pharmaceuticals, Inc. ("Par"); Perrigo New York, Inc. ("Perrigo"); Sandoz, Inc. ("Sandoz"); Sun Pharmaceutical Industries, Inc. ("Sun"); Taro Pharmaceuticals USA, Inc. ("Taro"); Teva Pharmaceuticals USA, Inc. ("Teva"); and Zydus Pharmaceuticals USA, Inc. ("Zydus").

18.     The fact that these companies and/or their employees received subpoenas from a federal grand jury is significant.  DOJ does not empanel grand juries lightly.  The *Antitrust Division Manual* admonishes that "staff should consider carefully the likelihood that, if a grand jury investigation developed evidence confirming the alleged anticompetitive conduct, the Division would proceed with a criminal prosecution."  Accordingly, before a grand jury investigation proceeds, it requires a series of approvals, first by the relevant field chief, who then sends the request to the Antitrust Criminal Enforcement Division.  "The DAAG [Deputy Assistant Attorney General] for Operations, the Criminal DAAG, and the Director of Criminal Enforcement will make a recommendation to the Assistant Attorney General[,]" who gives final approval and authorizes all attorneys who will participate in the investigation.[12]

---

[11] *Id.*

[12] DOJ, Antitrust Division Manual (5th ed. 2015) at Chapter III-81 to 83, *available at* http://www.justice.gov/atr/public/divisionmanual/chapter3.pdf

**FILED WITH REDACTIONS – PUBLIC VERSION**

19.    As Mark Rosman, former assistant chief of the National Criminal Enforcement Section of DOJ's Antitrust Division, noted in an article on the "unusual" nature of the criminal subpoenas, "A DOJ investigation into the alleged exchange of pricing information in the pharmaceutical industry likely indicates that the agency anticipates uncovering criminal antitrust conduct in the form of price-fixing or customer allocation."[13]

20.    Another significant indication of criminal price-fixing in the generic drug industry is that DOJ has received assistance from a privately-held company that came forward as a leniency applicant:  "It is understood that Heritage is cooperating with prosecutors in exchange for amnesty from criminal prosecution under DOJ's leniency program[.]"[14]  As explained on DOJ's website, an applicant for amnesty "must admit its participation in a criminal antitrust violation involving price fixing, bid rigging, capacity restriction, or allocation of markets, customers, or sales or production volumes, before it will receive a conditional leniency letter." The applicant must also establish that "[t]he confession of wrongdoing is truly a corporate act, as opposed to isolated confessions of individual executives or officials."[15]

21.    In addition to the federal criminal investigation, after years of investigation and on the basis of millions of documents as well as witness testimony, the Attorneys General of at least forty-seven States have filed a complaint in this MDL alleging an overarching conspiracy among generic drug manufacturers to fix prices and allocate customers. The States have made clear that

---

[13] Mark Rosman & Seth Silber, "DOJ's Investigation Into Generic Pharma Pricing Is Unusual," Law360 (Nov. 12, 2014), *available at*
 https://www.wsgr.com/publications/PDFSearch/rosman-1114.pdf
[14] Richard Vanderford, "Generic Pharma Investigation Still Broad, Prosecutor Says," mLex (Feb. 21, 2017).
[15] DOJ, *Frequently Asked Questions about the Antitrust Division's Leniency Program* (updated Jan. 26, 2017), *available a*t https://www.justice.gov/atr/page/file/926521/download

**FILED WITH REDACTIONS – PUBLIC VERSION**

they have "uncovered wide-ranging conduct implicating numerous different drugs and competitors"[16] and have stated in open court that complaints involving additional drugs and manufacturers will be filed in 2019.

22.    The State AG Complaint explains that the generic drug industry is structured in a way that facilitates these types of collusive communications. "Generic drug manufacturers operate, through their respective senior leadership and marketing and sales executives, in a manner that fosters and promotes routine and direct interaction among their competitors."  This affords them opportunities to "exploit their interactions at various and frequent industry trade shows, customer conferences and other similar events, to develop relationships and sow the seeds for their illegal agreements."[17]

23.    The indictments and guilty pleas relating to Glazer and Malek, the grand jury subpoenas, and evidence divulged in the State AG Complaint are merely the tip of the iceberg. The government investigations have uncovered the existence of "a broad, well-coordinated and long-running series of schemes to fix the prices and allocate markets for a number of generic pharmaceuticals in the United States."[18]

24.    And at least certain of the Defendants are the targets of investigations by federal antitrust regulators concerning the pricing of their generic pharmaceutical products.  In its August 8, 2015 10-Q, Allergan (Actavis's corporate parent) announced that on June 25, 2015, Actavis had "received a subpoena from the U.S. Department of Justice ('DOJ'), Antitrust Division seeking information relating to the marketing and pricing of certain of the Company's generic products

---

[16] *State of Connecticut v. Aurobindo Pharma USA, Inc.*, No. 3:16-cv-2056 (VLB) (D. Conn.) (Doc. 168 at ¶ 9) (State AG Amended Complaint).
[17] State AG Amended Complaint ¶ 7.
[18] State AG Amended Complaint ¶ 1.

FILED WITH REDACTIONS – PUBLIC VERSION

and communications with competitors about such products."  On September 8, 2016, Taro's parent company announced that Taro, "as well as two senior officers in its commercial team, received grand jury subpoenas from the United States Department of Justice, Antitrust Division, seeking documents relating to corporate and employee records, generic pharmaceutical products and pricing, communications with competitors and others regarding the sale of generic pharmaceutical products, and certain other related matters."

25.     In its August 4, 2016 6-K, Teva's parent company disclosed that on June 21, 2015, Teva "received a subpoena from the Antitrust Division of the United States Department of Justice seeking documents and other information relating to the marketing and pricing of certain of Teva USA's generic products and communications with competitors about such products."  In the same filing, Teva's parent company revealed that Teva "received a subpoena from the Connecticut Attorney General seeking documents and other information relating to potential state antitrust law violations."  Teva was subsequently named as defendant in the AG complaint.  While the AG complaint is currently limited to two drugs, it is styled as an "initial civil action" and expressly states that the investigation of the state attorneys general has revealed anticompetitive conduct involving "numerous different drugs and competitors, which will be acted upon at the appropriate time."

26.     In a February 28, 2017 letter filed in this action prior to its transfer to this Court, the DOJ confirmed that there are "significant overlaps between the companies and drugs that are being investigated criminally and the Defendants and drugs identified in plaintiffs' amended complaints in these civil actions [including the amended Fluocinonide complaint]."[19]

---

[19] *In re: Clobetasol Antitrust Litig.*, No. 1:16-mc-7229 (S.D.N.Y), ECF No. 58 at 1.

FILED WITH REDACTIONS – PUBLIC VERSION

27.     Plaintiffs do not yet have access to all of the information available to the government enforcement agencies.  What is known is that starting in June 2014, after representatives of the Defendants attended meetings of the Generic Pharmaceutical Association, Defendants abruptly and sharply raised their respective Fluocinonide prices to nearly identical levels.  The allegations herein demonstrate that the large and unprecedented price increases for Fluocinonide cannot be explained by normal, competitive market forces.  The explanation is collusion.

### III. THE ROLE OF INDEPENDENT PHARMACIES

28.     There are approximately 22,000 privately-owned independent pharmacies in the United States, as contrasted with chain drug stores such as CVS, Walgreens, and Rite Aid, and mass merchandiser or supermarket drug stores such as Wal-Mart, Target and Kroger. Over a billion prescriptions for U.S. patients are dispensed through independent pharmacies each year.

29.     Independent pharmacies rarely purchase generic drugs directly from the manufacturer, and instead acquire drugs almost exclusively from drug wholesalers such as McKesson Corp., Cardinal Health Inc., or Amerisource Bergen Corp. As one would expect, the wholesaler's price includes a percentage markup over the manufacturer's price. Independent pharmacies, lacking the sales volume heft and wholesaler relationships enjoyed by their much larger competitors, have no meaningful ability to negotiate these acquisition costs. They must pay the price the wholesaler charges. As a result, when drug manufacturers collude to allocate customers or raise the prices of generic drugs, independent pharmacies end up paying illegally inflated prices for those drugs.

FILED WITH REDACTIONS – PUBLIC VERSION

## IV.   **JURISDICTION AND VENUE**

30.     Plaintiffs bring Count One of this action under Section 16 of the Clayton Act (15 U.S.C. § 26) for injunctive relief and costs of suit, including reasonable attorneys' fees, against Defendants for the injuries sustained by Plaintiffs and the members of the Classes described herein by reason of the violations of Sections 1 and 3 of the Sherman Act (15 U.S.C. §§ 1, 3).

31.     This action is also instituted under the antitrust, unfair competition, consumer protection, and common laws of various states and territories for damages and equitable relief, as described in Counts Two through Four below.

32.     Jurisdiction is conferred upon this Court by 28 U.S.C. §§ 1331 and 1337 and by Section 16 of the Clayton Act (15 U.S.C. § 26). In addition, jurisdiction is conferred upon this Court by 28 U.S.C. §§ 1332(d) and 1367.

33.     Venue is proper in this District pursuant to 15 U.S.C. §§ 15(a) and 22 and 28 U.S.C §§ 1391(b), (c) and (d); and 1407 and MDL Order dated April 6, 2017 (ECF No. 291), and because, during the Class Period, Defendants resided, transacted business, were found, or had agents in this District, and a substantial portion of the affected interstate trade and commerce described below has been carried out in this District. Venue is also proper in this District because the federal grand jury investigating the pricing of generic drugs is empaneled here and therefore it is likely that acts in furtherance of the alleged conspiracy took place here. According to DOJ guidelines, an "investigation should be conducted by a grand jury in a judicial district where venue lies for the offense, such as a district from or to which price-fixed sales were made or where conspiratorial communications occurred."[20]

---

[20] DOJ, Antitrust Division Manual at III-83.

FILED WITH REDACTIONS – PUBLIC VERSION

34.     This Court has personal jurisdiction over each Defendant because, *inter alia*, each Defendant: (a) transacted business throughout the United States, including in this District; (b) sold Fluocinonide throughout the United States, including in this District; (c) had substantial contacts with the United States, including in this District; (d) was engaged in an illegal scheme and nationwide price-fixing conspiracy that was directed at, had the intended effect of causing injury to, and did cause injury to persons residing in, located in, or doing business throughout the United States, including in this District; and/or (e) took overt action in furtherance of the conspiracy in this District or conspired with someone who did, and by doing so could reasonably have expected to be sued in this District. In addition, nationwide personal jurisdiction was authorized by Congress pursuant to the Clayton Act and by 28 U.S.C. § 1407.

## V.    PARTIES

### A.  Plaintiffs

35.     Plaintiff West Val Pharmacy ("West Val") is a privately held independent pharmacy that has been in business since 1959 and is currently located at 5353 Balboa Boulevard in Encino, California. West Val Pharmacy indirectly purchased and continues to purchase Defendants' generic Fluocinonide products at supracompetitive prices during the Class Period, and was thereby injured and suffered damages as a result of Defendants' unlawful conduct.

36.     Plaintiff Halliday's & Koivisto's Pharmacy ("Halliday's") is an independent pharmacy located at 4133 University Boulevard in Jacksonville, Florida. Halliday's has served the Jacksonville community for over 50 years. Halliday's indirectly purchased and continues to purchase Defendants' generic Fluocinonide products at supracompetitive prices during the Class Period, and was thereby injured and suffered damages as a result of Defendants' unlawful conduct.

11

FILED WITH REDACTIONS – PUBLIC VERSION

37.     Plaintiff Russell's Mr. Discount Drugs, Inc. ("Russell's") was a privately held independent pharmacy located at 334 Depot Street, in Lexington, Mississippi from the time of its opening in February 1986 until it sold the prescription drugs portion of its business to a pharmacy chain on July 14, 2016. Russell's indirectly purchased Defendants' generic Fluocinonide products at supracompetitive prices during the class period, and was thereby injured and suffered damages as a result of Defendants' unlawful conduct.

38.     Plaintiff Falconer Pharmacy, Inc. ("Falconer") is a privately held independent pharmacy located in Falconer, New York. Falconer Pharmacy indirectly purchased and continues to purchase Defendants' generic Fluocinonide products at supracompetitive prices during the Class Period, and was thereby injured and suffered damages as a result of Defendants' unlawful conduct. Falconer made some purchases of Defendant Teva's Fluocinonide products directly from Teva.

39.     Plaintiff Chet Johnson Drug, Inc. ("Chet Johnson") is a privately held independent pharmacy in Amery, Wisconsin. Chet Johnson indirectly purchased and continues to purchase Defendants' generic Fluocinonide products at supracompetitive prices during the Class Period, and was thereby injured and suffered damages as a result of Defendants' unlawful conduct.

**B.  Defendants**

40.     Defendant **Actavis Holdco U.S. Inc.** ("Actavis") is a corporation with its principal place of business in Parsippany, New Jersey.  In August 2016, Teva Pharmaceuticals Industries Ltd acquired Allergan plc's ("Allergan") generics business (including Actavis generics).  Actavis manufactures, markets, and sells generic drug products.  During the Class Period, Actavis sold Fluocinonide products to customers in this District and other locations in the United States.  On or around September 2016, as part of Teva's acquisition of Allergan's generic business, Allergan divested its rights, title and interest in Fluocinonide products to Mayne Pharma LLC, and Mayne

Pharma Inc.  During the Class Period, Actavis sold Fluocinonide to purchasers in this District and throughout the United States.

41.     Defendant **Taro Pharmaceuticals USA, Inc.** ("Taro") is a New York corporation with its principal place of business in Hawthorne, New York.  Taro USA is a wholly-owned subsidiary of Defendant Taro Pharmaceutical Industries, Ltd.  During the Class Period, Taro sold Fluocinonide to purchasers in this District and throughout the United States.

42.     Defendant **Teva Pharmaceuticals USA, Inc.** ("Teva") is a Delaware corporation with its principal place of business in North Wales, Pennsylvania. It is a subsidiary of Teva Pharmaceutical Industries Ltd., an Israeli entity. Teva is registered with the Pennsylvania Department of State as a foreign corporation. On October 3 2016, Teva Pharmaceutical Industries Ltd. announced that it had completed its acquisition of the wholesaler Anda, Inc. ("Anda") and that "Anda, Inc., one of the leading distributors of generic medicines in the U.S., is now part of Teva."  As announced at the time, Anda, Inc. has "become part of Teva's distribution network," creating a functional economic unity between Teva and Anda such that, as of October 2016, Teva has sold its generic Fluocinonide products to independent pharmacies throughout the United States, including to Plaintiff Falconer Pharmacy.

43.     Various other persons, firms, corporations and entities have participated as co-conspirators with Defendants in the violations and conspiracy alleged herein. In order to engage in the violations alleged herein, these co-conspirators have performed acts and made statements in furtherance of the antitrust violations and conspiracies alleged herein.  Plaintiffs may amend this Complaint to allege the names of additional co-conspirators as they are discovered.

**FILED WITH REDACTIONS – PUBLIC VERSION**

## VI.   INTERSTATE COMMERCE

44.     During the Class Period, Defendants sold and distributed Fluocinonide in a continuous and uninterrupted flow of interstate commerce to customers throughout the United States, including in this District.

45.     Defendants' and their co-conspirators' conduct, including the marketing and sale of Fluocinonide, took place within, has had, and was intended to have, a direct, substantial, and reasonably foreseeable anticompetitive effect upon interstate commerce within the United States.

46.     Defendants' anticompetitive conduct occurred in part in trade and commerce within the states and territories set forth herein, and also had substantial intrastate effects in that, *inter alia*, drug wholesalers within each state and territory were foreclosed from offering less expensive Fluocinonide to Plaintiffs inside each respective state and territory. The foreclosure of these less expensive generic products directly impacted and disrupted commerce for Plaintiffs within each state and territory and forced Plaintiffs to pay supracompetitive prices.

## VII.   THE GENERIC FLUOCINONIDE CONSPIRACY

### A.  The Fluocinonide Market

63.     Fluocinonide is a topical corticosteroid used for the treatment of a variety of skin conditions, including eczema, dermatitis, psoriasis, and vitiligo.  It is one of the most widely prescribed dermatological drugs in the United States.

64.     The markets for Fluocinonide are mature, and Defendants that operate in those markets can only gain market share by competing on price.

65.     The Fluocinonide products at issue in this case are the generic versions of the brand name drug Lidex (or Lidex E in the case of the emulsified base version of the cream), which was approved by the U.S. Food and Drug Administration in the early 1970s.  Lidex was originally

developed by County Line Pharmaceuticals. County Line has discontinued sales of the cream, emulsified base cream, and gel versions of Lidex and there are no reported sales of any formulation of Lidex since at least January 2011.

66.    Generic versions of Fluocinonide have been available for purchase in the United States since the early 1990's. Several manufacturers had exited the Fluocinonide markets before Defendants' June 2014 price increases. Major Pharmaceuticals sold only *de minimis* amounts of Fluocinonide cream since January 2011 and sold less than 200 units between May 2014 and August 2016. Fougera stopped selling its Fluocinonide cream and emulsified base cream products in late 2012. It sold Fluocinonide ointment between April 2013 and February 2014, but beginning in March 2014 Fougera substantially cut its sales volume and was out of the market by September 2014. Fougera cut its sales of Fluocinonide gel beginning in July 2014, and by November 2014 was out of the market entirely.[21]

67.    ████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
█████████████████

68.    At all relevant times, Defendants had substantial market power with respect to Fluocinonide. Defendants exercised this power to maintain supracompetitive prices for Fluocinonide without losing so many sales as to make the elevated price unprofitable.

---

[21] Before exiting the market, Fougera raised its prices along with Taro and Teva.

[22] QuintilesIMS, formerly known as IMS Health, provides data to and about the pharmaceutical industry.

FILED WITH REDACTIONS – PUBLIC VERSION

69.     Defendants sold Fluocinonide at prices in excess of marginal costs, in excess of a competitive price, and enjoyed high profit margins.

70.     Through their market dominance, Defendants have successfully foreclosed the market to rival competition, thereby maintaining and enhancing market power and enabling Defendants to charge Plaintiffs supracompetitive prices for Fluocinonide .

**B.  Defendants increased the price of Fluocinonide**

71.     Competition in the Fluocinonide markets had caused prices to stabilize and remain relatively low from at least January 2012 until Defendants raised prices in June 2014.  Defendants' June 2014 price increases represented a departure from the stable pricing of prior years and from ordinary pricing practices, and are indicative of collusion.

72.     Data from the National Average Drug Acquisition Cost ("NADAC")[23] for Fluocinonide show the low and stable prices of Fluocinonide characteristic of the markets prior to the Defendants' price hikes, and the huge spike in price that occurred abruptly in June 2014.  Since that time, Defendants have continued to charge supracompetitive prices.

---

[23] NADAC is a measure of the cost of drugs developed by the National Association of State Medicaid Directors to set a single national pricing benchmark based on average drug acquisition costs.  NADAC price data is precise and accurate, according to the Centers for Medicare and Medicaid Services.

**FILED WITH REDACTIONS – PUBLIC VERSION**





FILED WITH REDACTIONS – PUBLIC VERSION





FILED WITH REDACTIONS – PUBLIC VERSION

73.     As the graphs illustrate, prior to Defendants' price increases the prices Fluocinonide remained flat and at competitive levels.  Then, starting in June of 2014, the average price of Fluocinonide increased by approximately 163%, with certain formulations increasing as much as 241%.

74.     The market-wide Fluocinonide price increases are the result of Defendants increasing their respective Fluocinonide prices at substantially the same time to substantially similar levels in the summer of 2014.  The following tables and graphs show the effective prices of each manufacturer for each formulation (gel, cream etc.) and size (15, 30, 60 g) of Fluocinonide .



**FILED WITH REDACTIONS – PUBLIC VERSION**



**FILED WITH REDACTIONS – PUBLIC VERSION**



**FILED WITH REDACTIONS – PUBLIC VERSION**



75.

76.

**FILED WITH REDACTIONS – PUBLIC VERSION**



77.

78.

**FILED WITH REDACTIONS – PUBLIC VERSION**



---

24 Effective prices are calculated to 12 decimals; for ease of reference, prices in this complaint are rounded to the nearest cent.  However, percentage increases are calculated based on the more precise calculated price (*i.e.*, the number defined by as many as 12 decimals).

**FILED WITH REDACTIONS – PUBLIC VERSION**



**FILED WITH REDACTIONS – PUBLIC VERSION**



82.

83.



84.

**FILED WITH REDACTIONS – PUBLIC VERSION**

85. ██████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████



**C.  As part of the conspiracy, some Defendants increased their WAC benchmarks in lockstep**

86.     The following graphs show the Defendants' WAC prices, which act as list prices in the pharmaceutical industry.[25]  These graphs, which use data from IMS, depict the Defendants' collusive behavior: each raised their WAC prices to essentially the same level.

---

[25] WAC prices are manufacturers' reported list prices for sale to wholesalers.  As list prices, they do not reflect discounts or rebates.

**FILED WITH REDACTIONS – PUBLIC VERSION**



**FILED WITH REDACTIONS – PUBLIC VERSION**



87.     The overcharges resulting from Defendants' conduct are directly traceable through the pharmaceutical distribution chain to independent pharmacies.  A manufacturer first sells the drug to direct purchaser wholesalers based on the listed WAC, minus applicable discounts.

**FILED WITH REDACTIONS – PUBLIC VERSION**

Wholesalers then sell the drug to pharmacies at a price based on the WAC. Independent pharmacies in particular cannot meaningfully negotiate their acquisition costs or their retail prices for insured patients (because these are subject to network agreements). Independent pharmacists may dispense drugs at a loss when they know certain uninsured patients will have trouble affording necessary drugs, but when the price increases are severe, the pharmacy's charity can reach only so far.

   **D.  No shortages or other market changes can justify Defendants' price increases**

   88.     No apparent, reasonable competitive justifications explain these abrupt shifts in pricing conduct.  To the contrary, anticompetitive activity explains these skyrocketing Fluocinonide prices.  As Richard Evans at Sector & Sovereign Research recently wrote: "[a] plausible explanation [for price increases of generic drugs] is that generic manufacturers, having fallen to near historic low levels of financial performance, are cooperating to raise the prices of products whose characteristics – low sales due to either very low prices or very low volumes – accommodate price inflation."[26]

   89.     The price increases cannot be attributed to the need to fund research and development.  Generic pharmaceutical firms do not incur the large research and development costs that brand firms absorb in developing new drugs.  Moreover, the costs associated with developing and obtaining FDA approval for Fluocinonide were incurred over 45 years ago when the drug was first introduced to the market.  Changes in ingredient costs also do not explain Defendants' price increase; the prices for formulations Fluocinonide not at issue in this case remained relatively stable, even though they have the same active ingredient as the formulations that experienced dramatic price increases. ████████████████████████████████████████████

---

[26] *See* http://blogs.wsj.com/pharmalot/2015/04/22/generic-drug-prices-keep-rising-but-is-aslowdown-coming.

**FILED WITH REDACTIONS – PUBLIC VERSION**

███████████████████████████████████████████

███████████████████████████████████████

90.     Defendants' enormous price increases were not due to supply disruptions.  With regard to drug shortages, federal law requires drug manufacturers to report potential shortages to the FDA, the reasons therefor, and the expected duration of the shortage,[27] but no supply disruption was reported by the relevant Defendants with respect to Fluocinonide in the summer of 2014. Fluocinonide does not appear in the American Society of Health-System Pharmacists databases of current and resolved drug shortages.   There were also no significant decreases in Defendants' overall sales volume that might indicate a shortage in the availability of Fluocinonide's active ingredient.

91.     Defendants' Fluocinonide price increases are also not explained by the entry or exit of competitors from the marketplace.  No significant sellers entered or left the Fluocinonide cream, emulsified cream, or ointment markets between January 2013 and July 2014 and there was no significant shift in Defendants' relative market shares.   While Sandoz left the gel market in September 2014, the market shares held by Sandoz, Taro, and Teva had remained stable since January 2013.  Prior to the price increases, the same group of manufacturers—the Defendants in this case—had been selling Fluocinonide at the same relatively low prices for at least two and a half years.

### E.  Defendants acknowledge the lack of generic drug competition

92.     Generic pharmaceutical executives frequently spoke publicly about pricing and competition in the market.   Members of the industry publicly acknowledged that they saw

---

[27] *See* http://www.fda.gov/Drugs/DrugSafety/DrugShortages/ucm050796.htm#q.

**FILED WITH REDACTIONS – PUBLIC VERSION**

competition as causing a problem that generally plagued the generic drug industry—namely, low prices—and praised drug markets involving other companies that did not compete on price.

93.    On Taro's second quarter 2014 earnings call on November 10, 2014, for example, Taro's CEO stated that sales volumes would not decline due to increasing prices in markets for generic drugs—"I don't think there will be any significant -- we have seen any significant impact of volume shifting because of price adjustments."

### F. Defendants had many opportunities to conspire on Fluocinonide

94.    Defendants' sudden and massive price increases represented a sharp departure from the previous years of low and stable prices.

95.    Defendants engaged in a conspiracy to raise and fix the prices of Fluocinonide . Defendants' reached agreement to raise their prices, and beginning in June 2014 implemented the price hikes described above.  This pricing behavior marked a drastic change from Defendants' previous pricing practices with respect to Fluocinonide.

96.    The price increases occurred close in time to Defendants' participation in a workshop hosted by the GPhA in North Bethesda, Maryland on June 3 and June 4, 2014. According to GPhA records, representatives of the following attended the June 2014 GPhA workshop: Actavis, Teva Pharmaceuticals USA, Teva Pharmaceuticals Industries Ltd., and Taro Pharmaceuticals USA, Inc.  In the months prior to implementing their agreement, Defendants also attended the annual meetings of the GPhA in February 2014 and the NACDS in April 2014.

97.    In a competitive market, sellers have incentives to cut prices to maintain or increase market share.  It would be economically irrational for an individual seller to drastically increase prices without assurances that its rivals would do the same.  Absent such assurances, the seller would risk a loss of market share that would more than offset the higher prices it was charging. Defendants knew that they would not lose market share, however, because they had agreed to each

34

raise prices so that customers had no cheaper source of supply and had no choice but to pay the skyrocketing prices for Fluocinonide.  As such, increasing prices would be economically irrational for a single Defendant, but increasing prices together as a result of collusion, however, proved extremely profitable for Defendants.

98.     As Defendants increased their Fluocinonide prices, they also allocated their relative market shares among themselves.  In the emulsified base cream and ointment markets, coordinated price increases by Taro and Teva coincided with Teva gaining a significant portion of Taro's market share.  In the gel market, by contrast, Teva exited the market entirely shortly after it implemented its price increase in tandem with Taro, ceding the entire market to Taro (as Sandoz, another gel manufacturer, had left the gel market in September 2014).  Taro and Teva collectively held more than 95% of the market share for cream when Actavis entered the market in May 2014.  Within a few months, the market was almost evenly divided among the three Defendants, with Actavis having gained significant market share despite its elevated price for cream.

99.     In order to be successful, collusive agreements require a level of trust among the conspirators. While this can be accomplished by one-on-one communications, collaboration is also fostered through industry associations, which facilitate relationships between individuals who should otherwise be predisposed to compete vigorously with each other.

100.    During the Class Period, Defendants conspired, combined, and contracted to fix, raise, maintain, and stabilize prices at which Fluocinonide would be sold, which had the intended and actual effect of causing Plaintiffs and the other members of the proposed Class to pay artificially inflated prices above prices that would exist if a competitive market had determined prices for Fluocinonide .

FILED WITH REDACTIONS – PUBLIC VERSION

101.    Beginning in June 2014, Defendants collectively caused the price of Fluocinonide to increase dramatically.  Defendants' conduct cannot be explained by normal competitive forces. It was the result of an agreement among Defendants to increase pricing and restrain competition for the sale of Fluocinonide in the United States.  The agreement was furthered through Defendants participation in trade association meetings and events.

102.    In formulating and effectuating their conspiracy, Defendants engaged in numerous anticompetitive activities, including, among other things:

(a)    Participating, directing, authorizing, or consenting to the participation of subordinate employees in meetings, conversations, and communications with co-conspirators to discuss the sale of Fluocinonide in the United States;

(b)    Participating, directing, authorizing, or consenting to the participation of subordinate employees in meetings, conversations, and communications with co-conspirators to allocate customers or rig bids for Fluocinonide sold in the United States;

(c)    Agreeing during those meetings, conversations, and communications to allocate customers for Fluocinonide sold in the United States;

(d)    Agreeing during those meetings, conversations, and communications not to compete against each other for certain customers for Fluocinonide sold in the United States;

(e)    Submitting bids, withholding bids, and issuing price proposal in accordance with the agreements reached;

(f)    Selling Fluocinonide in the United States at collusive and noncompetitive prices; and

(g)    Accepting payment for Fluocinonide sold in the United States at collusive and noncompetitive prices.

103.    To sustain a conspiracy, the conspirators must periodically communicate to ensure that all are adhering to the collective scheme. Here, these communications occurred primarily

FILED WITH REDACTIONS – PUBLIC VERSION

through (1) trade association meetings and conferences, and (2) private meetings, dinners and outings among smaller groups of generic drug manufacturers.

104.    The purpose of these secret, conspiratorial meetings, discussions, and communications was to ensure that all Defendants agreed to participate in, implement, and maintain an unlawful bid-rigging, price-fixing, and market and customer allocation scheme.

105.    Defendants were members of numerous trade associations, which they used to facilitate their conspiratorial communications and implement their anticompetitive scheme to raise, maintain, and stabilize the prices of Fluocinonide , and to allocate markets and customers for Fluocinonide, including, but not limited to, GPhA, NACDS, the Health Care Supply Chain Association, ████████████████████████████

106.    The GPhA is the "leading trade association for generic drug manufacturers."[28] GPhA was formed in 2000 from the merger of three industry trade associations: the Generic Pharmaceutical Industry Association, the National Association of Pharmaceutical Manufacturers, and the National Pharmaceutical Alliance.

107.    GPhA's website touts, "[b]y becoming part of GPhA, you can participate in shaping the policies that govern the generic industry" and lists its "valuable membership services, such as business networking opportunities, educational forums, access to lawmakers and regulators, and peer-to-peer connections."[29]  GPhA's "member companies supply approximately 90 percent of the generic prescription drugs dispensed in the U.S. each year."

---

[28] Ass'n for Accessible Medicines, *The Association*, *available at* http://www.gphaonline.org/about/the-gpha-association.  While MDL 2724 has been pending, the GPhA changed its name to the Association for Accessible Medicines.  *See* Russell Redman, *New name for Generic Pharmaceutical Association*, CHAIN DRUG REVIEW (Feb. 14, 2017), *available at* http://www.chaindrugreview.com/new-name-for-generic-pharmaceutical-association/.

[29] Ass'n for Accessible Medicines, *Membership*, *available at* http://www.gphaonline.org/about/membership.

37

FILED WITH REDACTIONS – PUBLIC VERSION

108.    Defendants are current or recent regular members of the GPhA. Regular Members "are corporations, partnerships or other legal entities whose primary United States business derives the majority of its revenues from sales of (1) finished dose drugs approved via ANDAs; (2) products sold as authorized generic drugs; (3) biosimilar/biogeneric products; or (4) DESI products."[30]

109.    Several of Defendants' high-ranking corporate officers have served on GPhA's Board of Directors before and during the Class Period.  Doug Boothe, President and CEO of Actavis, was on the Board in 2012.  Charlie Mayr, Global Chief Communications Officer of Actavis, Inc. served on the Board in 2013. And Jim Kedrowski of Sun Pharmaceutical (Taro's parent company) joined the GPhA Board in 2016.  Former Heritage CEO, Jeffrey Glazer, who pleaded guilty to federal criminal charges relating to the price fixing and other anticompetitive activity concerning generic pharmaceuticals, also served on GPhA's Board of Directors.

110.    Defendants (or their affiliates) attended the GPhA meetings shortly before and during the Class Period.  These meetings provided Defendants opportunities to collude.

---

[30] *Id.*

**FILED WITH REDACTIONS – PUBLIC VERSION**

| Event | Attendees |
|---|---|
| 2013 GPhA Annual Meeting<br><br>February 20-22, 2013<br>Orlando, Florida | • Actavis, Inc.<br>• Actavis Pharma<br>• Taro Pharmaceuticals<br>• Teva Americas Generics<br>• Teva API<br>• Teva North America<br>• Teva Pharmaceuticals Industries Ltd.<br>• Teva Pharmaceuticals USA, Inc. |
| 2013 GPhA CMC Workshop<br><br>June 4-5, 2013<br>Bethesda, Maryland | • Actavis, Inc.<br>• Actavis Pharma<br>• Taro Pharmaceuticals Industries Ltd.<br>• Taro Pharmaceuticals USA, Inc.<br>• Teva Pharmaceuticals Industries Ltd.<br>• Teva Pharmaceuticals<br>• Teva Pharmaceuticals Inc. |
| 2013 GPhA Fall Technical Conference<br><br>October 28-30, 2013<br>Bethesda, Maryland | • Actavis, Inc.<br>• Actavis Elizabeth LLC<br>• Actavis Mid Atlantic LLC<br>• Taro Pharmaceuticals Industries Ltd.<br>• Taro Pharmaceuticals USA, Inc.<br>• Teva API, Inc.<br>• Teva Pharmaceuticals Europe |
| 2014 GPhA Annual Meeting<br><br>February 19-21, 2014<br>Orlando, Florida | • Actavis, Inc.<br>• Taro Pharmaceuticals USA, Inc.<br>• Teva Canada<br>• Teva Pharmaceuticals USA, Inc. |
| 2014 GPhA CMC Workshop<br><br>North Bethesda, Maryland<br>June 3-4, 2014 | • Actavis, Inc.<br>• Actavis Elizabeth LLC<br>• Actavis Laboratories FL, Inc.<br>• Taro Pharmaceuticals Industries Ltd.<br>• Taro Pharmaceuticals USA, Inc.<br>• Teva Pharmaceuticals<br>• Teva Pharmaceutical Industry Ltd. |
| 2014 GPhA Fall Technical Conference<br><br>October 27-29, 2014<br>North Bethesda, Maryland | • Actavis<br>• Actavis Elizabeth LLC<br>• Actavis Laboratories FL, Inc.<br>• Actavis, Inc.<br>• Actavis plc<br>• Taro Pharmaceuticals Industries Ltd.<br>• Taro Pharmaceuticals, Inc.<br>• Taro Pharmaceuticals USA, Inc.<br>• Teva API, Inc.<br>• Teva Pharmaceutical Industry Ltd.<br>• Teva Pharmaceuticals<br>• Teva Pharmaceuticals, USA |

FILED WITH REDACTIONS – PUBLIC VERSION

| Event | Attendees |
|-------|-----------|
| 2015 GPhA Annual Meeting<br><br>February 9-11, 2015<br>Miami Beach, Florida | • Actavis<br>• Taro Pharmaceuticals USA, Inc.<br>• Teva<br>• Teva API, Inc.<br>• Teva Pharmaceuticals |
| 2015 GPhA CMC Workshop<br><br>June 9 - 10, 2015<br>North Bethesda, Maryland | • Actavis Inc.<br>• Taro Pharmaceuticals USA, Inc.<br>• Taro Pharmaceuticals Industries Ltd.<br>• Taro Pharmaceuticals Inc.<br>• Teva Pharmaceuticals USA |
| 2015 GPhA Fall Technical Conference<br><br>November    2    -    4,    2015<br>North Bethesda, Maryland | • Actavis<br>• Taro Pharmaceutical Industries Ltd.<br>• Taro Pharmaceuticals U.S.A., Inc.<br>• Teva API, Inc.<br>• Teva Pharmaceutical Industries<br>• Teva Pharmaceuticals |

111.    Defendants are also members of the National Association of Chain Drug Stores. The NACDS is a national trade association representing chain pharmacies. Membership is open to generic pharmaceutical manufacturers, wholesalers, and retail pharmacies and members may participate in NACDS committees and workgroups, and attend various conferences. Defendants Taro and Teva were members from 2012 through 2016.

112.    On April 26-29, 2014, the NACDS held its Annual Meeting at the Phoenician resort in Scottsdale, Arizona. NACDS describes the Annual Meeting as "the industry's most prestigious gathering of its most influential leaders," and a "classic 'Top-to-Top' business conference" for the pharmaceutical retailing and manufacturing industries. Attendees are provided a list of participating companies in advance, have access to private meeting rooms where executives can meet in person, and can attend a variety of business programs, invitation-only events, and social functions.

FILED WITH REDACTIONS – PUBLIC VERSION

113.    Executives, senior management, and salespeople from Defendants Actavis, Taro, and Teva attended the NACDS 2014 Annual Meeting:

(a)    **Actavis**: Paul Bisaro, Actavis Board Member; Andrew Boyer, President and CEO of North America Generics; Robert Stewart, Chief Operating Officer; Michael Reed, Executive Director of Trade Relations; and Paul Reed, Sr. Director of Trade Sales and Development;

(b)    **Taro**: Michael Perfetto, Chief Commercial Officer for Generic RX/OTC, US and Canada; Ara Aprahamian, Vice President of Sales and Marketing;

(c)    **Teva**: Allan Oberman, President and CEO of Teva Americas Generics; Maureen Cavanaugh, Sr. VP and Chief Operating Officer of North America Generics; Christine Baeder, Sr. VP of Customer and Marketing Operations; Teri Coward, Sr. Director, of Sales and Trade; Dave Rekenthaler, VP of Sales.

114.    Executives, senior management, and salespeople from Defendants Actavis, Taro, and Teva also attended the NACDS Annual Meeting for 2015, and representatives from Taro and Teva attended the NACDS Annual Meeting for 2016.  Both meetings took place at The Breakers resort in Palm Beach, Florida.

115.    In addition to its Annual Meeting, the NACDS hosts its annual "Total Store Expo," which according to the NACDS website, is "the industry's largest gathering of its most influential leaders. It is a combination of both strategic and tactical business meetings between existing and new trading partners and is attended by industry decision makers."

116.    On August 10-13, 2013, the NACDS held its Total Store Expo at the Sands Expo Convention Center in Las Vegas, Nevada.  The following representatives of Defendants, among others, attended:

(a)    **Actavis**: Andrew Boyer, President and CEO North America Generics; Anthony Giannone, Executive Director of Sales; Marc Falkin, Sr. VP of Sales; Napoleon Clark, VP of Marketing;

41

**FILED WITH REDACTIONS – PUBLIC VERSION**

(b)     **Taro**: Ara Aprahamian, VP of Sales and Marketing; Sheila Curran, VP of Sales Operations; Howard Marcus, VP of Sales and Marketing; Michael Perfetto, Chief Commercial Officer Generic RX/OTC, US and Canada; Doug Statler, Sr. Director/Head of Sales;

(c)     **Teva**: Allan Oberman, President and CEO of Teva Americas Generics; Maureen Cavanaugh, Sr. VP and Chief Operating Officer of North America Generics; Kevin Galownia, Head of Marketing Operations; Christine Baeder, Sr. VP of Customer and Marketing Operations; Theresa Coward, Sr. Director of Sales and Trade Relations; Jennifer Chang, Director of Marketing; Jonathan Kafer, EVP of Sales and Marketing; Dave Rekenthaler, VP of Sales.

117.     On August 23-26, 2014, the NACDS held its Total Store Expo at the Boston Convention Center in Massachusetts.  The following representatives of Defendants, among others, attended:

(a)     **Actavis**: Andrew Boyer, President and CEO North America Generics; David Buchen, EVP of Commercial, North American Generic and International; Anthony Giannone, Executive Director of Sales; Marc Falkin, Sr. VP of Sales; Napoleon Clark, VP of Marketing; Christina Koleto, Sr. Manager of Pricing;

(b)     **Taro**: Ara Aprahamian, VP of Sales and Marketing; Scott Brick, Manager, National Accounts; Kevin Kriel, Executive Director, Marketing and Business Development; Alex Likvornik, Sr. Director, Strategic Pricing and Marketing; Michael Perfetto, Chief Commercial Officer for Generic RX/OTC, US and Canada; Christopher Urbanski, Director, Corporate Accounts;

(c)     **Teva**: Maureen Cavanaugh, Sr. VP and Chief Operating Officer of North America Generics; Kevin Galownia, Head of Marketing Operations; Christine Baeder, Sr. VP of Customer and Marketing Operations; Teri Coward, Sr. Director of Sales and Trade Relations.

118.     Executives, senior management, and salespeople from Defendants Actavis, Taro (and its parent Sun), and Teva also attended NACDS's 2015 Total Store Expo on August 22-25 at the Colorado Convention Center in Denver.  Representatives of Defendants Taro and Teva also

**FILED WITH REDACTIONS – PUBLIC VERSION**

attended the 2016 Total Store Expo on August 19-22 at the San Diego Convention Center in San Diego, California.

119.    Executives, senior management, and salespeople from Defendants Actavis and Teva also attended NACDS' annual foundation dinner in 2013, 2014, and 2015—an event held every December in New York City.

120.    Representatives from Defendants Actavis and Teva also attended the February 2013, 2014, and 2016 NACDS Regional Chain Conferences, an annual event that brings together regional drug store chains and their suppliers.

121.    In addition to common membership in the GPhA and the NACDS, Defendants are involved in an array of buyer-side industry groups, through which they can share pricing strategies, bid terms, market allocation, and other competitively sensitive information.   The Minnesota Multistate Contracting Alliance for Pharmacy ("MMCAP") is a group purchasing organization operated by the State of Minnesota's Department of Administration.   According to its website, "MMCAP member facilities purchase over $1 billion per year and have national account status with all of the major brand name and generic pharmaceutical manufacturers."

122.    Generic pharmaceutical manufacturers are vendors for the MMCAP.  For instance, in 2014, Mark Blitman, Executive Director of Sales for Government Markets for Actavis, and Nick Gerebi, Director of National Accounts for Teva, served as vendors for the MMCAP.

123.    The Health Care Supply Chain Association is a trade association that represents group purchasing organizations, such as the MMCAP, and hosts events for the generic pharmaceutical industry.  Executives from both Actavis and Teva participated in the Health Care Supply Chain Association's LogiPharma Supply Chain Conference on September 16-18, 2014 in Princeton, New Jersey.

**FILED WITH REDACTIONS – PUBLIC VERSION**

124.    The Health Care Supply Chain Association also hosted the National Pharmacy Forum on February 16-18, 2015, in Tampa, Florida, where the following representatives of Defendants were present:

   (a)     **Actavis**: John Fallon, Executive Director of Sales;

   (b)     **Teva**: Nick Gerebi, Director of National Accounts; Jeff McClard, Sr. Director of National Accounts; Cam Bivens, Director of National Accounts; Brad Bradford, Director of National Accounts.

125.    At the National Pharmacy Forum, speaker topics included: "current pricing and spending trends"; "a critique of the rationale for high prices offered by manufacturers"; and "the U.S. pharmaceutical market and the ongoing changes within the pharmaceutical world," including "market trends."

126.    Defendants are involved in other industry groups through which they had the opportunity to conspire. ████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████

127.    ████████████████████████████████████████████

████████████████████████████████████████████████████

█████████████████████

44

**FILED WITH REDACTIONS – PUBLIC VERSION**

128.    In addition to providing an opportunity to share information about the generic pharmaceutical business, these trade association events often include recreational and social activities such as golfing, theater performances, cocktail parties, and dinners, which allowed Defendants' representatives to interact with their competitors privately and outside the traditional business setting.

129.    As uncovered in the state attorneys' general investigation, representatives of generic drug manufacturers get together separately, in more limited groups, allowing them to further meet face-to-face with their competitors and discuss their business.  In fact, high-level executives of many generic drug manufacturers get together periodically for what at least some of them refer to as "industry dinners."[31]

130.    A large number of generic drug manufacturers, including all Defendants here, are headquartered in close proximity to one another in New York, New Jersey or eastern Pennsylvania, giving them easier and more frequent opportunities to meet and collude.   For example, in January 2014, at a time when the prices of a number of generic drugs were reportedly soaring, and a few months before Defendants' Fluocinonide products' prices hiked, at least thirteen high-ranking male executives, including CEOs, Presidents, and Senior Vice Presidents of various generic drug manufacturers, met at a steakhouse in Bridgewater, New Jersey.

131.    Generic pharmaceutical sales women also get together regularly for what they refer to as a "Girls' Night Out" ("GNO"), or alternatively "Women in the Industry" meetings and dinners.   During these GNOs, meetings and dinners, these representatives meet with their competitors and discuss competitively sensitive information.  Several different GNOs were held

---

[31] *See, e.g.*, *State of Connecticut et al. v. Aurobindo et al.* (D. Conn.), at ¶ ¶ 50-60, *available at* http://www.ct.gov/ag/lib/ag/press_releases/2016/20161215_gdms_complain.pdf.

**FILED WITH REDACTIONS – PUBLIC VERSION**

in 2015, including: (1) in Baltimore, Maryland in May, and (2) at the NACDS conference in August.

132.    Through these various interactions, Defendants' sales and marketing executives are often acutely aware of their competition and, more importantly, each other's current and future business plans.  This familiarity gives them the opportunity to communicate about bids and pricing strategy, and share information regarding the terms of their contracts with customers, including various terms relating to pricing, price protection, and rebates.

133.    Defendants' common membership in trade associations such as the GPhA and the NACDS, among others, and the participation of industry executives in trade association events and related activities, gave Defendants ample opportunities to exchange information concerning the pricing of their Fluocinonide products and to reach and implement agreements to increase the prices of those products.

**G.  Defendants' concerted efforts to increase prices for generic Fluocinonide yielded supracompetitive profits**

134.    Defendants' collusive price increases provided them with artificially inflated profits—profits that were funded in part by independent pharmacy purchasers of Fluocinonide .

135.    **Actavis**: ████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████

136.    **Taro**: ██████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████

137.    In an earnings call just a few months after increasing its Fluocinonide prices, Taro's parent company reported that it was "realizing the benefits of the previous quarter's price adjustments in the current quarter," and in a 2016 20-F filing reported that its gross profits increased over $100 million between the fiscal years ending in March 2015 and March 2016—"primarily the result of the full year impact of prior year price adjustments on select products."

138.    **Teva**: ███████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████

139.    Teva's parent company reported in its 2016 20-F that revenues from generic medicines sold in the United States increased by $246 million from 2013 to 2014 (when the price increases began) and by $375 million from 2014 to 2015 (the first full year of sales at the elevated price).

## H.  The Fluocinonide market is susceptible to collusion

140.    Publicly available data on the Fluocinonide markets in the United States demonstrate that it is susceptible to cartelization by Defendants. Factors that make a market susceptible to collusion include: (1) a high degree of industry concentration; (2) significant barriers to entry; (3) inelastic demand; (4) the lack of available substitutes for the goods involved; (5) a standardized product with a high degree of interchangeability between the products of cartel participants; and (6) inter-competitor contacts and communication.

### 1.  Industry concentration

141.    A high degree of concentration facilitates the operation of a cartel because it makes it easier to coordinate behavior among co-conspirators.

142.    Fluocinonide is available in six different formulations—cream (0.05%), cream (0.1%), emulsified base cream, ointment, gel, and solution.  The cream (0.05%), emulsified base

47

cream, ointment and gel formulations each experienced coordinated and dramatic price increases in June 2014 and are at issue in this action.  The markets for the Fluocinonide formulations at issue here were predominantly controlled by Defendants at the time of the price increases:



143.    As the charts show, when Defendants implemented their price increases, they controlled the Fluocinonide  markets.

48

**FILED WITH REDACTIONS – PUBLIC VERSION**

144.    While the market for Fluocinonide  is sufficiently concentrated to facilitate collusion, the years of low and stable pricing in the market establish that the number of manufacturers in the market was sufficient to drive competition. Absent collusion, prices would have remained at competitive levels.

145.    No departures from the market by manufacturers of Fluocinonide can explain the price increases.

146.    Defendants have been able to maintain supracompetitive prices for Fluocinonide without significant loss of market share to non-conspirators.  Thus, Defendants have oligopolistic market power in the market for Fluocinonide.

147.    The magnitude of Defendants' price increases for Fluocinonide distinguishes them from non-collusive oligopolistic pricing.  Non-collusive oligopolistic pricing would be expected to proceed incrementally, as manufacturers test the waters to see if competitors will follow a price increase.  But here the increases are extreme, and such extreme pricing moves are not rational in the absence of advance knowledge that competitors will join the increase.

**2.   Barriers to entry**

148.    Supracompetitive pricing in a market normally attracts additional competitors who want to avail themselves of the high levels of profitability that are available. However, the presence of significant barriers to entry makes this more difficult and helps to facilitate the operation of a cartel.

149.    There are significant capital, regulatory, and intellectual property barriers to entry in the Fluocinonide markets that make such entry time-consuming and expensive.  Among other things, prospective generic manufacturers must establish manufacturing processes sufficient to safely produce large amounts of bioequivalent product.  The manufacturing facilities must follow

FILED WITH REDACTIONS – PUBLIC VERSION

the FDA's rigorous Current Good Manufacturing Practice regulations.  These challenges can be particularly pronounced for dermatological products like Fluocinonide.  As Kal Sundaram, former CEO of Taro's parent company has explained, the FDA's testing requirements for dermatological products "makes [their] development more expensive and also it takes more time."[32]

150.    In addition to the substantial out-of-pocket costs required to bring a drug to market, the approval process for generic drugs is lengthy.  As Kansas Senator Jerry Moran commented on September 21, 2016 during Congressional hearings on the FDA's role in the generic drug market, "there are more than 4,000 generic drug applications currently awaiting approval, and the median time it takes for the FDA to approve a generic is now 47 months or nearly four years."[33]  In its 2014 10-K, Actavis's parent company (at the time) stated that "[t]he ANDA drug development and approval process generally takes three to four years."  This significant delay for new market entrants effectively precludes new competition from eroding the supracompetitive prices as a result of the conspiracy.

### 3.   Inelastic demand

151.    A product exhibits completely inelastic demand if buyers will continue to buy it regardless of the price. No product is completely inelastic, but prescription medicines come close.

152.    Demand for Defendants' Fluocinonide products is inelastic largely because, while they are somewhat interchangeable with one another, they cannot be substituted for other products given their pharmacological characteristics.   Additionally, the incentives of actors in the Fluocinonide market are not sensitive to price, as they are in most other markets.  Doctors who

---

[32] https://seekingalpha.com/article/3645596-taro-pharmaceutical-industries-taro-ceo-kal-sundaram-q2-2015-results-earnings-call-transcript?page=8

[33] http://www.appropriations.senate.gov/imo/media/doc/092116-Chairman-Moran-Opening-Statement.pdf.

**FILED WITH REDACTIONS – PUBLIC VERSION**

prescribe Fluocinonide have the best therapy and not the cheapest cost in mind; patients cannot write themselves a prescription for a cheaper substitute or comfortably forgo treatment; and pharmacies have no choice but to fill the prescription as written.  When Defendants increased their Fluocinonide prices, independent pharmacies could not simply purchase and dispense less-expensive alternative products.

153.    In order for a cartel to profit from raising prices above competitive levels, demand must be sufficiently inelastic such that any loss in sales will be more than offset by increases in revenue on those sales that are made.  Otherwise, increased prices would result in declining sales, as customers purchased substitute products or declined to buy altogether. Inelastic demand is a market characteristic that facilitates collusion, allowing producers to raise their prices without triggering customer substitution and lost sales revenue.

154.    The chart below shows the change in average prices and sales of Defendants' Fluocinonide products from the year prior to Defendants' price increases to the year after the price increases:



155.    The Fluocinonide formulations at issue in this case are also not therapeutically equivalent to, and are not substitutes for, the solution formulation or the 0.1% cream.  The sales volume of the solution formulation (which is not at issue in this case), for example, did not experience sustained increased sales volume as a result of Defendants' price increases of other formulations.

**FILED WITH REDACTIONS – PUBLIC VERSION**

156.    This inelastic demand gave Defendants significant pricing power, as well as an incentive to collude.

157.    Thus, Fluocinonide is an excellent candidate for cartelization because price increases will result in more revenue, rather than less, provided that most or all manufacturers participate.

### 4.  Lack of substitutes

158.    Fluocinonide is a Class II, high potency topical corticosteroid used to treat a wide variety of skin conditions, including eczema, psoriasis, and dermatitis.  There are typically no substitute drugs that afford patients the same level of efficacy as Fluocinonide.  As a Class II corticosteroid, Fluocinonide is stronger than corticosteroids in Classes III-VII, but milder than Class I corticosteroids.  There are at most four other corticosteroids in Class II, and those products have different active ingredients—and thus different therapeutic properties, benefits, and drawbacks—than Fluocinonide.

159.    Fluocinonide is also often the only effective medicine when indicated.  Patients prescribed Fluocinonide by their doctor consider it a medical necessity that must be purchased without regard to an increase in price.

160.    Fluocinonide is also differentiated from other drug products because of its regulatory status.  A generic drug is considered a therapeutic equivalent of—and AB-rated with respect to—the Reference Listed Drug (RLD) (often the brand name version of a drug).  Defendants' Fluocinonide products are not therapeutically equivalent to—or AB-rated with respect to—other drug products, even similar ones.  Thus, a patient prescribed Fluocinonide could not purchase a different drug using his or her Fluocinonide prescription, regardless of the respective prices of the drugs.

FILED WITH REDACTIONS – PUBLIC VERSION

161.    Each formulation of Fluocinonide has unique dermatological properties and uses, and the formulations are thus not substitutes for one another.  The ointment formulation is, for example, generally considered the strongest delivery mechanism, and is prescribed accordingly. Many other characteristics likewise differentiate the indications and uses for the various Fluocinonide formulations.

162.    In addition, the branded version of Fluocinonide does not serve as economic substitute for generic versions of Fluocinonide.  Branded products generally maintain substantial price premiums over their generic counterparts, making them inapt substitutes even when generic prices soar.  With respect to Fluocinonide, as noted above, years before the price increases for the generic Fluocinonide products, County Line had ended its sales of Lidex and Lidex-E.

163.    Thus, purchasers of Fluocinonide are held captive to the supracompetitive prices that resulted from Defendants' conspiracy to fix prices and allocate markets and customers.

**5.    Standardized product**

164.    A commodity-like product is one that is standardized across suppliers and allows for a high degree of substitutability among different suppliers in the market. When products offered by different suppliers are viewed as interchangeable by purchasers, it is easier for the suppliers to agree on prices for the goods in question and to monitor those prices effectively.

165.    Generic drugs of the same chemical composition are effectively commodity products because the primary mechanism through which they compete is price. When approving an ANDA, the FDA confirms that a generic drug product is bioequivalent to the branded version of the drug.  This allows pharmacists to substitute that generic for the branded counterpart, as well as for any other generic that also is bioequivalent to the branded product.

FILED WITH REDACTIONS – PUBLIC VERSION

166.    For each formulation of Fluocinonide, Defendants' Fluocinonide products are bioequivalent generics of their branded counterparts, enabling pharmacists to substitute them (any of them) for branded products.   Defendants' Fluocinonide cream products are thus each interchangeable, as are Defendants' emulsified base cream, ointment, and gel products.

167.    Moreover, because Fluocinonide products are interchangeable, there is little utility in attempting to distinguish the products based on quality, branding or service.   Accordingly, manufacturers generally spend little effort advertising or detailing (the practice of providing promotional materials and free samples to physicians) their generic compounds.   The primary means for one generic manufacturer to differentiate its product from another's is through price competition.[34] The need to compete on price can drive producers of commodity products to conspire—as they did here—to fix prices.

### 6.    Inter-competitor contacts and communications

168.    As detailed above, Defendants' representatives met at conferences convened by customers and trade associations of customers ( ███████████ and NACDS), private industry dinners, and similar events. Moreover, Defendants are members of and/or participants of the GPhA; thus, their representatives have many opportunities to meet and conspire at industry meetings. As noted in press reports, "prosecutors are taking a close look at trade associations as part of their investigation as having been one potential avenue for facilitating the collusion between salespeople at different generic producers."[35]

---

[34] *See, e.g.,* GAO Report at 23 ("If another manufacturer offers a lower price to a customer, manufacturers we interviewed indicated that they are usually asked to match it or risk losing market share to the other manufacturer.").

[35] PaRR Report.

FILED WITH REDACTIONS – PUBLIC VERSION

169.    The State AG Complaint alleges that Defendants routinely coordinated their schemes through direct interaction with their competitors at industry trade shows, customer conferences, and other events. For example, Defendants Glazer and Malek admitted at their guilty plea hearings to engaging in discussions and attending meetings with competitors, during which they reached agreements to allocate customers, rig bids and fix prices of doxycycline hyclate and glyburide.

170.    DOJ's and the Connecticut AG's investigations, and the grand jury subpoenas and investigative demands that have issued in conjunction with them, focus on inter-competitor communications.  These types of communications are not unique or isolated, but are rampant; "[g]eneric drug manufacturers operate, through their respective senior leadership and marketing and sales executives, in a manner that fosters and promotes routine and direct interaction among their competitors."[36] The sheer number of companies implicated in the investigations highlights the prevalence in the generic drug industry of the types of contacts and communications that facilitate collusion.   In addition to the Defendants named in this Complaint, the following companies have also been identified as targets of government investigations:

   (a)    **Aurobindo**: Aurobindo has disclosed receipt of a subpoena relating to the DOJ's generic drug investigation.[37] The company stated that it "received a subpoena in Mar[ch] 2016 requesting non-product specific information."[38]

   (b)    **Citron**:  In December 2016, Aceto Corporation (which purchased Citron's generic drugs assets) disclosed that DOJ "executed a search warrant against the Company and also served a subpoena requesting

---

[36] State AG Amended Complaint ¶ 7.

[37] Zeba Siddiqui, "India's Aurobindo shares hit nine-month low on US price-fixing lawsuit," Reuters (Dec 16, 2016), *available at* http://www.reuters.com/article/us-aurobindo-pharm-stocks-idUSKBN1450DV

[38] Aurobindo Pharma, Ltd., BSE Disclosure (Dec. 16, 2016), *available at* http://www.bseindia.com/xml-data/corpfiling/AttachHis/3C8E03C7_A46F_4792_AED5_197E6961A77E_125855.pdf

FILED WITH REDACTIONS – PUBLIC VERSION

documents and other information concerning potential antitrust violations in the sale of Glyburide, Glyburide/Metformin, and Fosinopril HCTZ products." The Connecticut AG requested that Citron produce all documents produced to DOJ.[39]

(c)    **Dr. Reddy's**:  In November 2016, Dr. Reddy's disclosed that it received subpoenas from DOJ and the Connecticut AG "seeking information relating to the marketing, pricing and sale of certain . . . generic products and any communications with competitors about such products."[40]

(d)    **Heritage**:  As a private company, Heritage is not required to make public disclosures.  Nonetheless, in the wake of the criminal guilty pleas by two of its executives, Heritage confirmed that it is "fully cooperating" with DOJ[41] and press reports indicate that Heritage has applied to DOJ's leniency program seeking amnesty for a cartel violation.[42]

(e)    **Impax**:  In July 2014, Impax disclosed that it received a subpoena from the Connecticut AG concerning sales of generic digoxin.[43]  In November 2014, Impax disclosed that an employee received a broader federal grand jury subpoena that requested testimony and documents about "any communication or correspondence with any competitor (or an employee of any competitor) in the sale of generic prescription medications."[44] In February 2016, Impax disclosed that it received a DOJ subpoena requesting "information and documents regarding the sales, marketing, and pricing of certain generic prescription medications. In particular… digoxin tablets, terbutaline

---

[39] Aceto Corp., SEC Form 8-K, Ex. 99.5, *available at* https://www.sec.gov/Archives/edgar/data/2034/000157104916020771/t1600804_ex99-5.htm

[40] Dr. Reddy's, SEC Form 6-K (Nov. 10, 2016), *available at* http://www.drreddys.com/investors/reports-and-filings/sec-filings/?year=FY17

[41] Tom Schoenberg , David McLaughlin & Sophia Pearson, "U.S. Generic Drug Probe Seen Expanding After Guilty Pleas," Bloomberg (Dec. 14, 2016), *available at* https://www.bloomberg.com/news/articles/2016-12-14/u-s-files-first-charges-in-generic-drug-price-fixing-probe

[42] *See supra* ¶20.

[43] Impax SEC Form 8-K (July 15, 2014), *available at* https://www.sec.gov/Archives/edgar/data/1003642/000143774914012809/ipxl20140715_8k.htm

[44] Impax SEC Form 8-K (Nov. 6, 2014), *available at* https://www.sec.gov/Archives/edgar/data/1003642/000119312514402210/d816555d8k.htm

FILED WITH REDACTIONS – PUBLIC VERSION

sulfate tablets, prilocaine/lidocaine cream, and calcipotriene topical solution."[45]

(f) **Lannett**: In July 2014, Lannett disclosed that it received a subpoena from the Connecticut AG relating to its investigation into the price-fixing of digoxin.[46] On November 3, 2014, Lannett disclosed that a Senior Vice President of Sales and Marketing was served with a grand jury subpoena "relating to a federal investigation of the generic pharmaceutical industry into possible violations of the Sherman Act." The subpoena also requested "corporate documents of the Company relating to communications or correspondence with competitors regarding the sale of generic prescription medications, but is not specifically directed to any particular product and is not limited to any particular time period."[47] On August 27, 2015, Lannett further explained that DOJ sought, among other things, "communications or correspondence with competitors regarding the sale of generic prescription medications, and the marketing, sale, or pricing of certain products, generally for the period of 2005 through the dates of the subpoenas."[48]

(g) **Mayne**: On August 25, 2016, Mayne Pharma Group Limited (the parent of Mayne) disclosed that it was "one of numerous generic pharmaceutical companies to receive a subpoena…seeking information relating to marketing, pricing and sales of select generic drugs" and that it had received a subpoena from the Connecticut AG seeking similar information.[49] On November 4, 2016, Mayne Pharma Group Limited issued a press release stating: "Previously on 28 Jun[e] 2016, Mayne Pharma Group Limited disclosed that it was one of several generic companies to receive a subpoena from the Antitrust Division of the US Department of Justice (DOJ) seeking information relating to the marketing, pricing and sales of select generic products. The investigation relating to Mayne Pharma

---

[45] Impax, SEC 2015 Form 10-K (Feb. 22, 2016), at F-53, *available at* https://www.sec.gov/Archives/edgar/data/1003642/000143774916025780/ipxl20151231_10k.htm

[46] Lannett press release (July 16, 2014), *available at* http://lannett.investorroom.com/2014-07-16-Lannett-Receives-Inquiry-From-Connecticut-Attorney-General

[47] Lannett, SEC Form 10-Q (Nov. 6, 2014) at 16, *available at* https://www.sec.gov/Archives/edgar/data/57725/000110465914077456/a14-20842_110q.htm

[48] Lannett, SEC Form 10-K (Aug. 27, 2015) at 18, available at http://www.sec.gov/Archives/edgar/data/57725/000110465915062047/a15-13005_110k.htm

[49] Mayne Pharma, 2016 Annual Report (Aug. 25, 2016), at 75, *available at* https://www.maynepharma.com/media/1788/2016-mayne-pharma-annual-report.pdf

**FILED WITH REDACTIONS – PUBLIC VERSION**

is focused on doxycycline hyclate delayed-release tablets (generic) and potassium chloride powders."[50]

(h) **Mylan**:  In February 2016, Mylan disclosed that it received a DOJ subpoena "seeking information relating to…generic Doxycycline" and a similar subpoena from the Connecticut AG seeking "information relating to…certain of the Company's generic products (including Doxycycline) and communications with competitors about such products."[51] On Nov. 9, 2016, Mylan disclosed that "certain employees and a member of senior management, received subpoenas from the DOJ seeking additional information relating to the marketing, pricing and sale of our generic Cidofovir, Glipizide-metformin, Propranolol and Verapamil products" and that "[r]elated search warrants also were executed" in connection with DOJ's investigation.[52]

(i) **Par**:  In March 2015, Par disclosed that it received subpoenas from the Connecticut AG and DOJ relating to digoxin and doxycycline.[53] In November 2015, Endo International plc, the parent company of Par, elaborated: "In December 2014, our subsidiary, Par, received a Subpoena to Testify Before Grand Jury from the Antitrust Division of the DOJ and issued by the U.S. District Court for the Eastern District of Pennsylvania. The subpoena requests documents and information focused primarily on product and pricing information relating to Par's authorized generic version of Lanoxin (digoxin) oral tablets and Par's generic doxycycline products, and on communications with competitors and others regarding those products. Par is currently cooperating fully with the investigation."[54] Endo also disclosed that in December 2015 it "received Interrogatories and Subpoena Duces Tecum from the State of

---

[50] Mayne Pharma, Update on DOJ Investigation (Nov. 4, 2016), *available at* http://asxcomnewspdfs.fairfaxmedia.com.au/2016/11/04/01798874-137879061.pdf

[51] Mylan, SEC 2015 Form 10-K (Feb. 16, 2016), at 160, *available at* https://www.sec.gov/Archives/edgar/data/1623613/000162361316000046/myl10k_20151231xdoc.htm

[52] Mylan SEC Form 10-Q, at 58 (Nov. 9, 2016), *available at* https://www.sec.gov/Archives/edgar/data/1623613/000162361316000071/myl10q_20160930xdoc.htm

[53] Par Pharmaceuticals Companies, Inc., SEC 2014 Form 10-K (Mar. 12, 2015) at 37, *available at* https://www.sec.gov/Archives/edgar/data/878088/000087808815000002/prx-20141231x10k.htm

[54] Endo International plc, SEC Form 10-Q (March 31, 2016) at 30, *available at* https://www.sec.gov/Archives/edgar/data/1593034/000159303416000056/endp-3312016x10q.htm

FILED WITH REDACTIONS – PUBLIC VERSION

Connecticut Office of Attorney General requesting information regarding pricing of certain of its generic products, including Doxycycline Hyclate, Amitriptyline Hydrochloride, Doxazosin Mesylate, Methotrexate Sodium and Oxybutynin Chloride."[55]

(j)     **Perrigo**:  On May 2, 2017, Perrigo disclosed that "search warrants were executed at the Company's corporate offices associated with an ongoing investigation by the U.S. Department of Justice Antitrust Division related to drug pricing in the pharmaceutical industry."[56]

(k)     **Sandoz**:  In March 2016, Sandoz and Fougera Pharmaceuticals Inc. (a wholly owned subsidiary of Sandoz) "received a subpoena from the Antitrust Division of the US Department of Justice (DoJ) requesting documents related to the marketing and pricing of generic pharmaceutical products…and related communications with competitors."[57]

(l)     **Sun**:  On May 27, 2016, Sun Pharmaceutical Industries, Ltd. (the parent of Sun) stated in a filing with the National Stock Exchange of India that one of its U.S subsidiaries, namely Sun, "received a grand jury subpoena from the United States Department of Justice, Antitrust Division seeking documents…relating to corporate and employee records, generic pharmaceutical products and pricing, communications with competitors and others regarding the sale of generic pharmaceutical products, and certain other related matters."[58]

(m)    **Zydus**:  Press reports have stated the Zydus is a target of DOJ's generic drugs price-fixing investigation.[59]

---

[55] *Id.* at 31.

[56] Perrigo Press Release (May 2, 2017), *available at* http://perrigo.investorroom.com/2017-05-02-Perrigo-Discloses-Investigation

[57] Novartis 2016 Financial Report at 217, *available at* https://www.novartis.com/sites/www.novartis.com/files/ar-2016-financial-report-en.pdf

[58] Sun Pharmaceuticals Indus., Ltd., BSE Disclosure (May 27, 2016), *available at* http://www.bseindia.com/xml-data/corpfiling/AttachHis/8E568708_8D00_472E_B052_666C76A4263D_081648.pdf

[59] *See* Rupali Mukherjeel, "US polls, pricing pressure may hit Indian pharma cos," The Times of India (Nov. 8, 2016), *available at* http://timesofindia.indiatimes.com/business/india-business/US-polls-pricing-pressure-may-hit-Indian- pharma-cos/articleshow/55301060.cms

FILED WITH REDACTIONS – PUBLIC VERSION

## VIII.   THE STATUTES OF LIMITATIONS DO NOT BAR PLAINTIFFS' CLAIMS

### A.  The statutes of limitations did not begin to run because Plaintiffs did not and could not discover Defendants' unlawful conspiracy

171.    Plaintiffs had no knowledge of the combination or conspiracy alleged herein, or of facts sufficient to place them on inquiry notice of the claims set forth herein, until (at the earliest) Defendants' disclosures of the existence of the government investigations and subpoenas. Prior to that time, no information in the public domain or available to Plaintiffs suggested that any Defendant was involved in a criminal conspiracy to fix prices for Fluocinonide. And indeed, Defendants' disclosures regarding the government investigations did not indicate Fluocinonide specifically.

172.    No information evidencing antitrust violations was available in the public domain prior to the public announcements of the government investigations that revealed sufficient information to suggest that any of the defendants was involved in a criminal conspiracy to fix prices for Fluocinonide.

173.    Plaintiffs had no direct contact with any of the Defendants in this case by which they could have discovered Defendants' conspiracy.

174.    Defendants repeatedly and expressly stated throughout the Class Period, including on their public Internet websites, that they maintained antitrust/fair competition policies which prohibited the type of collusion alleged in this Complaint. For example:

> (a)     Allergan's (predecessor to Actavis) Code of Conduct states: "We support a free and open market, which is why we comply with competition laws everywhere we do business and strive to always compete fairly."[60]

---

[60] Allergan Code of Conduct, *available at* http://www.allergan.com/investors/corporate-governance/code-of-conduct

**FILED WITH REDACTIONS – PUBLIC VERSION**

(b)     Taro's Code of Conduct provides: "we do not discuss any of the following topics with our competitors: prices or price-fixing, customer or market allocation, bids or bid-rigging, any topic that seems to be about restricting competition.  If a competitor attempts to engage you in a discussion on any of these topics, make it clear that you do not wish to participate. Leave the conversation immediately, and report the matter to Corporate Compliance."[61]

(c)     Taro's parent company, Sun Pharmaceutical Industries, Ltd.'s Global Code of Conduct provides: "We seek to outperform our competition fairly and honestly. We seek competitive advantages through superior performance, never through unethical or illegal business practices." It goes on to state: "Sun Pharma shall compete only in an ethical and legitimate manner and prohibits all actions that are anti-competitive or otherwise contrary to applicable competition or anti-trust laws."[62]

(d)     Teva's Code of Conduct provides: "We believe that customers and society as a whole benefit from fair, free and open markets. Therefore, we compete on the merits of our products and services and conduct business with integrity. We recognize that the potential harm to Teva's reputation and the penalties for breaching competition laws are severe, and can subject Teva, members of the Board of Directors and employees to severe civil fines and criminal penalties."[63]

175.    It was reasonable for members of the Class to believe that Defendants were complying with their own antitrust policies.

176.    For these reasons, the statutes of limitations as to Plaintiffs' claims under the federal and state common laws identified herein did not begin to run, and have been tolled with respect to the claims that Plaintiffs have alleged in this Complaint.

**B.  Active concealment tolled the statutes of limitations**

177.    In the alternative, application of the doctrine of fraudulent concealment tolled the statutes of limitations on the claims asserted by Plaintiffs.  Plaintiffs had no knowledge of the

---

[61] Taro Code of Conduct, *available at* http://www.taro.com/media/oMedia/TaroCOC.pdf

[62] Sun Pharma Global Code of Conduct, *available at* http://www.sunpharma.com/Shareholder-Information/Policies/93092/Global-Code-of-Conduct

[63] Teva Code of Conduct, *available at* http://www.tevapharm.com/files/about/corporate_governance/code_of_conduct/TEVA_CodeOf Conduct_FINAL_111715%5B2%5D.pdf

61

combination or conspiracy alleged in this Complaint, or of facts sufficient to place them on inquiry notice of their claims, until Defendants disclosed the existence of government investigations and subpoenas. Prior to that time, no information in the public domain or available to Plaintiffs suggested that any Defendant was involved in a criminal conspiracy to fix prices for Fluocinonide.

178.    No information evidencing antitrust violations was available in the public domain prior to the public announcements of the government investigations that revealed sufficient information to suggest that any of the defendants was involved in a criminal conspiracy to fix prices for Fluocinonide.

179.    As described in more detail below, Defendants actively concealed, suppressed, and omitted to disclose material facts to Plaintiffs and members of the Classes concerning Defendants' unlawful activities to artificially inflate prices for Fluocinonide. The concealed, suppressed, and omitted facts would have been important to Plaintiffs and members of the Classes as they related to the cost of Fluocinonide they purchased. Defendants misrepresented the real cause of price increases and/or the absence of price reductions in Fluocinonide. Defendants' false statements and conduct concerning the prices of Fluocinonide were deceptive as they had the tendency or capacity to mislead Plaintiffs and members of the Classes to believe that they were purchasing Fluocinonide at prices established by a free and fair market.

### 1.    Active concealment of the conspiracy

180.    Defendants engaged in an illegal scheme to fix prices, allocate customers and rig bids. Criminal and civil penalties for engaging in such conduct are severe.  Not surprisingly, Defendants took affirmative measures to conceal their conspiratorial conduct.

181.    Through their misleading, deceptive, false and fraudulent statements, Defendants effectively concealed their conspiracy, thereby causing economic harm to Plaintiffs and the

FILED WITH REDACTIONS – PUBLIC VERSION

Classes. Defendants' misrepresentations regarding their price changes were intended to lull Plaintiffs and the Classes into accepting the price hikes as a normal result of competitive and economic market trends rather than as the consequence of Defendants' collusive acts. The public statements made by Defendants were designed to mislead Plaintiffs and the Classes into paying unjustifiably higher prices for Fluocinonide.

182.    As explained in the State AG complaint, the nature of the generic drug industry—which allows for frequent and repeated face-to-face meetings among competitors—means that "Most of the conspiratorial communications were intentionally done in person or by cell phone, in an attempt to avoid creating a record of their illegal conduct. The generic drug industry, through the aforementioned opportunities to collude at trade shows, customer events and smaller more intimate dinners and meetings, allowed these communications to perpetuate."[64]

183.    These types of false statements and others made by Defendants helped conceal the illegal conspiracy entered into by Defendants to fix, stabilize, maintain and raise the price of Fluocinonide to inflated, supracompetitive levels.

**2.    Plaintiffs exercised reasonable diligence**

184.    Defendants' anticompetitive conspiracy, by its very nature, was self-concealing. Generic drugs are not exempt from antitrust regulation, and thus, before the disclosure of the government investigations, Plaintiffs reasonably considered the markets to be competitive. Accordingly, a reasonable person under the circumstances would not have been alerted to investigate the legitimacy of Defendants' prices before these disclosures.

---

[64] State AG Amended Complaint ¶ 13.

**FILED WITH REDACTIONS – PUBLIC VERSION**

185.    Because of the deceptive practices and techniques of secrecy employed by Defendants and their co-conspirators to conceal their illicit conduct, Plaintiffs and the Classes could not have discovered the conspiracy at an earlier date by the exercise of reasonable diligence.

186.    Therefore, the running of any statutes of limitations has been tolled for all claims alleged by Plaintiffs and the Classes as a result of Defendants' anticompetitive and unlawful conduct.  Despite the exercise of reasonable diligence, Plaintiffs and Members of the Classes were unaware of Defendants' unlawful conduct, and did not know that they were paying supracompetitive prices throughout the United States during the Class Period.

187.    For these reasons, Plaintiffs' claims are timely under all of the federal, state and common laws identified herein.

## IX.    CONTINUING VIOLATIONS

188.    This Complaint alleges a continuing course of conduct (including conduct within the limitations periods), and defendants' unlawful conduct has inflicted continuing and accumulating harm within the applicable statutes of limitations. Thus, Plaintiffs and the members of the Damages Class can recover for damages that they suffered during any applicable limitations period.

## X.    DEFENDANTS' ANTITRUST VIOLATIONS

189.    During the Class Period, set forth below, Defendants engaged in a continuing agreement, understanding, and conspiracy in restraint of trade to allocate customers, rig bids, and fix raise and/or stabilize prices for Fluocinonide sold in the United States.

190.    In formulating and effectuating the contract, combination or conspiracy, Defendants identified above and their co-conspirators engaged in anticompetitive activities, the

64

**FILED WITH REDACTIONS – PUBLIC VERSION**

purpose and effect of which were to allocate customers, rig bids and artificially fix, raise, maintain, and/or stabilize the price of Fluocinonide sold in the United States. These activities included the following:

> (a)  Defendants participated in meetings and/or conversations regarding the price of Fluocinonide in the United States;
>
> (b)  Defendants agreed during those meetings and conversations to charge prices at specified levels and otherwise to increase and/or maintain prices of Fluocinonide sold in the United States;
>
> (c)  Defendants agreed during those meetings and conversations to allocate customers, rig bids, and fix the price of Fluocinonide; and
>
> (d)  Defendants issued price announcements and price quotations in accordance with their agreements.

191.   Defendants and their co-conspirators engaged in the activities described above for the purpose of effectuating the unlawful agreements described in this Complaint.

192.   During and throughout the period of the conspiracy alleged in this Complaint, Plaintiffs and members of the Classes indirectly purchased Fluocinonide at inflated and supracompetitive prices.

193.   Defendants' contract, combination and conspiracy constitutes an unreasonable restraint of trade and commerce in violation of Sections 1 and 3 of the Sherman Act (15 U.S.C. §§ 1, 3) and the laws of various IRP Damages Jurisdictions enumerated below.

194.   As a result of Defendants' unlawful conduct, Plaintiffs and the other members of the Classes have been injured in their business and property in that they have paid more for Fluocinonide than they would have paid in competitive markets.

195.   General economic principles recognize that any overcharge at a higher level of distribution generally results in higher prices at every level below. Moreover, the institutional structure of pricing and regulation in the pharmaceutical drug industry assures that overcharges at the higher level of distribution are passed on to independent pharmacies such as Plaintiffs.

Wholesalers and retailers passed on the inflated prices to Plaintiffs and members of the Class. The impairment of generic competition at the direct purchaser level similarly injured Plaintiffs who were equally denied the opportunity to purchase less expensive generic versions Fluocinonide.

196.    The unlawful contract, combination and conspiracy has had the following effects, among others:

    (a)    price competition in the market for Fluocinonide has been artificially restrained;

    (b)    prices for Fluocinonide sold by Defendants have been raised, fixed, maintained, or stabilized at artificially high and non-competitive levels; and

    (c)    independent pharmacy purchasers of Fluocinonide sold by Defendants have been deprived of the benefit of free and open competition in the markets for Fluocinonide.

## XI.    CLASS ACTION ALLEGATIONS

197.    Plaintiffs bring this action on behalf of themselves and as a class action under Rule 23(a) and (b)(2) of the Federal Rules of Civil Procedure, seeking equitable and injunctive relief on behalf of the following class (the "Nationwide Class"):

All privately held pharmacies in the United States and its territories that purchased Defendants' Fluocinonide products (including generic Fluocinonide topical cream, ointment, emollient cream or gel) from June 1, 2014 through the present.

This class excludes: (a) defendants, their officers, directors, management, employees, subsidiaries and affiliates; (b) any pharmacies owned in part by judges or justices involved in this action or any members of their immediate families; (c) all pharmacies owned or operated by publicly traded companies.

198.    Plaintiffs also bring this action on behalf of themselves and as a class action under Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure seeking damages pursuant to the common law of unjust enrichment and the state antitrust, unfair competition, and consumer

**FILED WITH REDACTIONS – PUBLIC VERSION**

protection laws of the states and territories listed below (the "IRP Damages Jurisdictions")[65] on behalf of the following class (the "Damages Class"):

> All privately held pharmacies in the IRP Damage Jurisdictions that purchased Defendants' Fluocinonide products (including generic Fluocinonide topical cream, ointment, emollient cream or gel) from June 1, 2014 through the present.[66]
>
> This class excludes:   (a) defendants, their officers, directors, management, employees, subsidiaries and affiliates; (b) any pharmacies owned in part by judges or justices involved in this action or any members of their immediate families; (c) all pharmacies owned or operated by publicly traded companies.

199.   The Nationwide Class and the Damages Class are referred to herein as the "Classes."

200.   While Plaintiffs do not know the exact number of the members of the Classes, rosters of members of national independent pharmacy organizations indicate that there are at least 20,000 members in each class.

201.   Common questions of law and fact exist as to all members of the Classes. This is particularly true given the nature of Defendants' conspiracy, which was generally applicable to all the members of both Classes, thereby making appropriate relief with respect to the Classes as a whole. Such questions of law and fact common to the Classes include, but are not limited to:

> (a)   Whether Defendants and their co-conspirators engaged in a combination and conspiracy among themselves to fix, raise, maintain and/or stabilize prices of generic Fluocinonide and/or

---

[65] The IRP Damages Jurisdictions, for purposes of this complaint, are: Alabama, Alaska, Arizona, Arkansas, California, Colorado, Connecticut, Delaware, Florida, Georgia, Idaho, Illinois, Iowa, Kansas, Louisiana, Maine, Maryland, Massachusetts, Michigan, Minnesota, Mississippi, Missouri, Montana, Nebraska, Nevada, New Hampshire, New Jersey, New Mexico, New York, North Carolina, North Dakota, Oregon, Pennsylvania, Rhode Island, South Carolina, South Dakota, Tennessee, Texas, Utah, Vermont, Virginia, Washington, West Virginia, Wisconsin and Wyoming as well as the District of Columbia, Puerto Rico and the U.S. Virgin Islands.

[66] Plaintiffs may seek to certify state classes rather than a single Damages Class. See ¶ 206.

FILED WITH REDACTIONS – PUBLIC VERSION

engaged in market allocation for generic Fluocinonide sold in the United States;

(b)    The identity of the participants of the alleged conspiracy;

(c)    The duration of the alleged conspiracy and the acts carried out by Defendants and their co-conspirators in furtherance of the conspiracy;

(d)    Whether the alleged conspiracy violated the Sherman Act, as alleged in the First and Second Counts;

(e)    Whether the alleged conspiracy violated state antitrust and unfair competition laws, and/or state consumer protection laws, as alleged in the Third and Fourth Counts;

(f)    Whether Defendants unjustly enriched themselves to the detriment of the Plaintiffs and the members of the Classes, thereby entitling Plaintiffs and the members of the Classes to disgorgement of all benefits derived by Defendants, as alleged in the Fifth Count;

(g)    Whether the conduct of Defendants and their co-conspirators, as alleged in this Complaint, caused injury to the business or property of Plaintiffs and the members of the Classes;

(h)    The effect of the alleged conspiracy on the prices of generic Fluocinonide sold in the United States during the Class Period;

(i)    Whether the Defendants and their co-conspirators actively concealed, suppressed, and omitted to disclose material facts to Plaintiffs and members of the Classes concerning Defendants' unlawful activities to artificially inflate prices for generic Fluocinonide, and/or fraudulently concealed the unlawful conspiracy's existence from Plaintiffs and the other members of the Classes;

(j)    The appropriate injunctive and related equitable relief for the Nationwide Class; and

(k)    The appropriate class-wide measure of damages for the Damages Class.

202.    Plaintiffs' claims are typical of the claims of the members of the Classes.  Plaintiffs and all members of the Classes are similarly affected by Defendants' wrongful conduct in that they

paid artificially inflated prices for Defendants' generic Fluocinonide products. Plaintiffs' claims arise out of the same common course of conduct giving rise to the claims of the other members of the Classes.

203.    Plaintiffs will fairly and adequately protect the interests of the Classes. Plaintiffs' interests are coincident with, and not antagonistic to, those of the other members of the Classes. Plaintiffs are represented by counsel who are competent and experienced in the prosecution of antitrust and class action litigation.

204.    The questions of law and fact common to the members of the Classes predominate over any questions affecting only individual members, including legal and factual issues relating to liability and damages.

205.    Class action treatment is a superior method for the fair and efficient adjudication of the controversy, in that, among other things, such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently and without the unnecessary duplication of evidence, effort and expense that numerous individual actions would engender. The benefits of proceeding through the class mechanism, including providing injured persons or entities with a method for obtaining redress for claims that might not be practicable to pursue individually, substantially outweigh any difficulties that may arise in management of this class action. Plaintiffs reserve the discretion to certify the Damages Class as separate classes for each of the IRP Damages Jurisdictions or as separate classes for certain groups of IRP Damages Jurisdictions, should the Court's subsequent decisions in this case render that approach more efficient. Whether certified together or separately, the total number and identity of the members of the Damages Class would remain consistent.

206.    The prosecution of separate actions by individual members of the Classes would create a risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants.

## XII.    CAUSES OF ACTION

### FIRST COUNT

**Violation of Sections 1 and 3 of the Sherman Act
(on behalf of Plaintiffs and the Nationwide Class)**

212.    Plaintiffs incorporate by reference the allegations set forth above as if fully set forth herein.

213.    Defendants and their unnamed co-conspirators entered into and engaged in a contract, combination, or conspiracy in unreasonable restraint of trade in violation of Sections 1 and 3 of the Sherman Act (15 U.S.C. § 1, 3).

214.    During the Class Period, Defendants and their co-conspirators entered into a continuing agreement, understanding and conspiracy in restraint of trade to artificially allocate customers, rig bids and raise, maintain and fix prices for generic Fluocinonide, thereby creating anticompetitive effects.

215.    The conspiratorial acts and combinations have caused unreasonable restraints in the market for generic Fluocinonide.

216.    As a result of Defendants' unlawful conduct, Plaintiffs and other similarly situated independent pharmacies in the Nationwide Class who purchased generic Fluocinonide have been harmed by being forced to pay inflated, supracompetitive prices for generic Fluocinonide.

217.    In formulating and carrying out the alleged agreement, understanding and conspiracy, Defendants and their co-conspirators did those things that they combined and

70

conspired to do, including, but not limited to, the acts, practices and course of conduct set forth herein.

218.    Defendants' conspiracy had the following effects, among others:

(a)    Price competition in the market for generic Fluocinonide has been restrained, suppressed, and/or eliminated in the United States;

(b)    Prices for generic Fluocinonide provided by Defendants and their co-conspirators have been fixed, raised, maintained, and stabilized at artificially high, non-competitive levels throughout the United States; and

(c)    Plaintiffs and members of the Nationwide Class have been deprived of the benefits of free and open competition.

219.    Plaintiffs and members of the Nationwide Class have been injured and will continue to be injured in their business and property by paying more for generic Fluocinonide purchased indirectly from Defendants and the co-conspirators than they would have paid and will pay in the absence of the conspiracy.

220.    Defendants' contract, combination, or conspiracy is a *per se* violation of the federal antitrust laws.

221.    Plaintiffs and members of the Nationwide Class are entitled to an injunction against Defendants, preventing and restraining the continuing violations alleged herein.

**SECOND COUNT**

**Violation of Sections 1 and 3 of the Sherman Act**
**(on behalf of Plaintiff Falconer and the Damages Class for purchases made directly from Defendants)**

222.    Plaintiffs incorporate by reference the allegations set forth above as if fully set forth herein.

71

223.     As a result of Defendants' unlawful conduct in violation of Sections 1 and 3 of the Sherman Act (15 U.S.C. § 1, 3), Plaintiffs and other similarly situated pharmacies in the Damages Class who made direct purchases of Fluocinonide from Defendants were forced to pay inflated, supracompetitive prices for generic Fluocinonide.

224.     Plaintiff Falconer and members of the Damages Class who made such direct purchases seek treble damages, and the cost of suit, including reasonable attorney's fees, as per 15 U.S.C. § 15(a).

## THIRD COUNT

### Violation of State Antitrust Statutes[67]
### (on behalf of Plaintiffs and the Damages Class)

225.     Plaintiffs incorporate by reference the allegations set forth above as if fully set forth herein.

226.     During the Class Period, Defendants and their co-conspirators engaged in a continuing contract, combination or conspiracy with respect to the sale of generic Fluocinonide in unreasonable restraint of trade and commerce and in violation of the various state antitrust and other statutes set forth below.

---

[67] Statutory antitrust violations are alleged herein for the following jurisdictions: Alabama, Arizona, California, Connecticut, ~~Illinois~~, Iowa, Kansas, Maine, Maryland, Michigan, Minnesota, Mississippi, Nebraska, Nevada, New Hampshire, New Mexico, New York, North Carolina, North Dakota, Oregon, Rhode Island, South Carolina, Tennessee, Utah, Vermont, West Virginia, Wisconsin and the District of Columbia

**FILED WITH REDACTIONS – PUBLIC VERSION**

227.    The contract, combination, or conspiracy consisted of an agreement among Defendants and their co-conspirators to fix, raise, inflate, stabilize, and/or maintain the prices of generic Fluocinonide and to allocate customers for generic Fluocinonide in the United States.

228.    In formulating and effectuating this conspiracy, Defendants and their co-conspirators performed acts in furtherance of the combination and conspiracy, including:

(a)    participating in meetings and conversations among themselves in the United States and elsewhere during which they agreed to price generic Fluocinonide at certain levels, and otherwise to fix, increase, inflate, maintain, or stabilize effective prices paid by Plaintiffs and members of the Damages Class with respect to generic Fluocinonide provided in the United States; and

(b)    participating in meetings and trade association conversations among themselves in the United States and elsewhere to implement, adhere to, and police the unlawful agreements they reached.

229.    Defendants and their co-conspirators engaged in the actions described above for the purpose of carrying out their unlawful agreement to allocate customers, rig bids, and fix prices for generic Fluocinonide. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

230.    In addition, defendants have profited significantly from the conspiracy. Defendants' profits derived from their anticompetitive conduct come at the expense and detriment of plaintiffs and the members of the Damages Class.

231.    Accordingly, plaintiffs and the members of the Damages Class in each of the following jurisdictions seek damages (including statutory damages where applicable), to be trebled or otherwise increased as permitted by a particular jurisdiction's antitrust law, and costs of suit, including reasonable attorneys' fees, to the extent permitted by the following state laws.

FILED WITH REDACTIONS – PUBLIC VERSION

232.     Defendants' anticompetitive acts described above were knowing, willful and constitute violations or flagrant violations of the following state antitrust statutes:

233.     **Alabama:** Defendants have entered into an unlawful agreement in restraint of trade in violation of Alabama Code § 6-5-60, et seq. Defendants' combinations and conspiracy had the following effects: (1) price competition for generic Fluocinonide was restrained, suppressed, and eliminated throughout Alabama; (2) generic Fluocinonide prices were raised, fixed, maintained and stabilized at artificially high levels throughout Alabama. During the Class Period, Defendants' illegal conduct substantially affected Alabama commerce. By reason of the foregoing, Defendants entered into an agreement in restraint of trade in violation of Alabama Code § 6-5-60, et seq. Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief available under Alabama Code § 6-5-60, et seq.

234.     **Arizona:** Defendants have entered into an unlawful agreement in restraint of trade in violation of Arizona Revised Statutes, § 44-1401, et seq. Defendants' combination and conspiracy had the following effects: (1) price competition for generic Fluocinonide was restrained, suppressed, and eliminated throughout Arizona; (2) generic Fluocinonide prices were raised, fixed, maintained and stabilized at artificially high levels throughout Arizona. During the Class Period, Defendants' illegal conduct substantially affected Arizona commerce. Defendants' violations of Arizona law were flagrant.  As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants entered into an agreement in restraint of trade in violation of Ariz. Rev. Stat. § 44-1401, et seq. Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief available under Ariz. Rev. Stat. § 44-1401, et seq.

**FILED WITH REDACTIONS – PUBLIC VERSION**

235.    **California:** Defendants have entered into an unlawful agreement in restraint of trade in violation of California Business and Professions Code § 16700 et seq. During the Class Period, Defendants and their co-conspirators entered into and engaged in a continuing unlawful trust in restraint of the trade and commerce described above in violation of California Business and Professions Code §16720. Defendants, and each of them, have acted in violation of § 16720 to fix, raise, stabilize, and maintain prices of generic Fluocinonide at supracompetitive levels. The aforesaid violations of § 16720 consisted, without limitation, of a continuing unlawful trust and concert of action among Defendants and their co-conspirators, the substantial terms of which were to fix, raise, maintain, and stabilize the prices of generic Fluocinonide. For the purpose of forming and effectuating the unlawful trust, Defendants and their co-conspirators have done those things which they combined and conspired to do, including, but not limited to, the acts, practices and course of conduct set forth above and creating a price floor, fixing, raising, and stabilizing the price of generic Fluocinonide. The combination and conspiracy alleged herein has had, inter alia, the following effects: (1) price competition for generic Fluocinonide has been restrained, suppressed, and/or eliminated in the State of California; (2) prices for generic Fluocinonide provided by Defendants and their co-conspirators have been fixed, raised, stabilized, and pegged at artificially high, non-competitive levels in the State of California; and (3) those who purchased generic Fluocinonide indirectly from Defendants and their co-conspirators have been deprived of the benefit of free and open competition. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property in that they paid more for generic Fluocinonide than they otherwise would have paid in the absence of Defendants' unlawful conduct. During the Class Period, Defendants' illegal conduct substantially affected California commerce. As a result of Defendants' violation of § 16720,

75

Plaintiffs and members of the Damages Class seek treble damages and their cost of suit, including a reasonable attorney's fee, pursuant to California Business and Professions Code § 16750(a).

236.   **District of Columbia:** Defendants have entered into an unlawful agreement in restraint of trade in violation of District of Columbia Code Annotated § 28-4501, et seq. Defendants' combination and conspiracy had the following effects: (1) generic Fluocinonide price competition was restrained, suppressed, and eliminated throughout the District of Columbia; (2) generic Fluocinonide prices were raised, fixed, maintained and stabilized at artificially high levels throughout the District of Columbia; (3) Plaintiffs and members of the Damages Class, including those who resided in the District of Columbia and/or purchased generic Fluocinonide in the District of Columbia that were shipped by Defendants or their co-conspirators into the District of Columbia, were deprived of free and open competition, including in the District of Columbia; and (4) Plaintiffs and members of the Damages Class, including those who resided in the District of Columbia and/or purchased generic Fluocinonide in the District of Columbia that were shipped by Defendants or their co-conspirators, paid supracompetitive, artificially inflated prices for generic Fluocinonide, including in the District of Columbia. During the Class Period, Defendants' illegal conduct substantially affected District of Columbia commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of District of Columbia Code Ann. § 28-4501, et seq. Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief available under District of Columbia Code Ann. § 28-4501, et seq.

237.   ~~**Illinois:** Defendants have entered into an unlawful agreement in restraint of trade in violation of the Illinois Antitrust Act (740 Illinois Compiled Statutes 10/1, et seq.) Defendants'~~

~~combination or conspiracy had the following effects: (1) generic Fluocinonide price competition~~ ~~was restrained, suppressed, and eliminated throughout Illinois; (2) generic Fluocinonide prices~~ ~~were raised, fixed, maintained, and stabilized at artificially high levels throughout Illinois. During~~ ~~the Class Period, Defendants' illegal conduct substantially affected Illinois commerce. As a direct~~ ~~and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages~~ ~~Class have been injured in their business and property and are threatened with further injury.~~ ~~Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief available under~~ ~~the Illinois Antitrust Act.~~[68]

238. **Iowa:** Defendants have entered into an unlawful agreement in restraint of trade in violation of Iowa Code § 553.1, et seq. Defendants' combination or conspiracy had the following effects: (1) generic Fluocinonide price competition was restrained, suppressed, and eliminated throughout Iowa; (2) generic Fluocinonide prices were raised, fixed, maintained and stabilized at artificially high levels throughout Iowa. During the Class Period, Defendants' illegal conduct substantially affected Iowa commerce. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of Iowa Code § 553.1, et seq. Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief available under Iowa Code § 553, et seq.

239. **Kansas:** Defendants have entered into an unlawful agreement in restraint of trade in violation of Kansas Statutes Annotated, § 50-101, et seq. Defendants' combined capital, skills or acts for the purposes of creating restrictions in trade or commerce of generic Fluocinonide, increasing the prices of generic Fluocinonide, preventing competition in the sale of generic

---

[68] Plaintiffs acknowledge that this claim was dismissed with prejudice by the Court's February 15, 2019 Order (16-md-2724 Dkt. 858) and reassert the claim here solely for purposes of preservation for appeal.

FILED WITH REDACTIONS – PUBLIC VERSION

Fluocinonide, or binding themselves not to sell generic Fluocinonide, in a manner that established the price of generic Fluocinonide and precluded free and unrestricted competition among themselves in the sale of generic Fluocinonide, in violation of Kan. Stat. Ann. § 50-101, et seq. Defendants' combination or conspiracy had the following effects: (1) generic Fluocinonide price competition was restrained, suppressed, and eliminated throughout Kansas; (2) generic Fluocinonide prices were raised, fixed, maintained and stabilized at artificially high levels throughout Kansas. During the Class Period, Defendants' illegal conduct substantially affected Kansas commerce. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of Kansas Stat. Ann. § 50-101, et seq. Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief available under Kansas Stat. Ann. § 50-101, et seq.

240.    **Maine:** Defendants have entered into an unlawful agreement in restraint of trade in violation of Maine Revised Statutes (Maine Rev. Stat. Ann. 10, § 1101, et seq.) Defendants' combination or conspiracy had the following effects: (1) generic Fluocinonide price competition was restrained, suppressed, and eliminated throughout Maine; (2) generic Fluocinonide prices were raised, fixed, maintained and stabilized at artificially high levels throughout Maine. During the Class Period, Defendants' illegal conduct substantially affected Maine commerce. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of Maine Rev. Stat. Ann. 10, § 1101, et seq. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Maine Rev. Stat. Ann. 10, § 1101, et seq.

241.    **Michigan:** Defendants have entered into an unlawful agreement in restraint of trade in violation of Michigan Compiled Laws Annotated § 445.771, et seq. Defendants' combination or conspiracy had the following effects: (1) generic Fluocinonide price competition was restrained,

**FILED WITH REDACTIONS – PUBLIC VERSION**

suppressed, and eliminated throughout Michigan; (2) generic Fluocinonide prices were raised, fixed, maintained and stabilized at artificially high levels throughout Michigan. During the Class Period, Defendants' illegal conduct substantially affected Michigan commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of Michigan Comp. Laws Ann. § 445.771, et seq. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Michigan Comp. Laws Ann. § 445.771, et seq.

242.    **Minnesota:** Defendants have entered into an unlawful agreement in restraint of trade in violation of Minnesota Annotated Statutes § 325D.49, et seq. Defendants' combination or conspiracy had the following effects: (1) generic Fluocinonide price competition was restrained, suppressed, and eliminated throughout Minnesota; (2) generic Fluocinonide prices were raised, fixed, maintained and stabilized at artificially high levels throughout Minnesota. During the Class Period, Defendants' illegal conduct substantially affected Minnesota commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of Minnesota Stat. § 325D.49, et seq. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Minnesota Stat. § 325D.49, et seq.

243.    **Mississippi:** Defendants have entered into an unlawful agreement in restraint of trade in violation of Mississippi Code Annotated § 75-21-1, et seq. Trusts are combinations, contracts, understandings or agreements, express or implied when inimical to the public welfare and with the effect of, inter alia, restraining trade, increasing the price or output of a commodity,

**FILED WITH REDACTIONS – PUBLIC VERSION**

or hindering competition in the production and sale of a commodity. Miss. Code Ann. § 75-21-1. Defendants' combination or conspiracy was in a manner inimical to public welfare and had the following effects: (1) generic Fluocinonide price competition was restrained, suppressed, and eliminated throughout Mississippi; (2) generic Fluocinonide prices were raised, fixed, maintained and stabilized at artificially high levels throughout Mississippi. During the Class Period, Defendants' illegal conduct substantially affected Mississippi commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of Mississippi Code Ann. § 75-21-1, et seq. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Mississippi Code Ann. § 75-21-1, et seq.

244.    **Nebraska:** Defendants have entered into an unlawful agreement in restraint of trade in violation of Nebraska Revised Statutes § 59-801, et seq. Defendants' combination or conspiracy had the following effects: (1) generic Fluocinonide price competition was restrained, suppressed, and eliminated throughout Nebraska; (2) generic Fluocinonide prices were raised, fixed, maintained and stabilized at artificially high levels throughout Nebraska. During the Class Period, Defendants' illegal conduct substantially affected Nebraska commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of Nebraska Revised Statutes § 59-801, et seq. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Nebraska Revised Statutes § 59-801, et seq.

FILED WITH REDACTIONS – PUBLIC VERSION

245.    **Nevada:** Defendants have entered into an unlawful agreement in restraint of trade in violation of Nevada Revised Statutes Annotated § 598A.010, et seq. Defendants' combination or conspiracy had the following effects: (1) generic Fluocinonide price competition was restrained, suppressed, and eliminated throughout Nevada; (2) generic Fluocinonide prices were raised, fixed, maintained and stabilized at artificially high levels throughout Nevada. During the Class Period, Defendants' illegal conduct substantially affected Nevada commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of Nevada Rev. Stat. Ann. § 598A.010, et seq. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Nevada Rev. Stat. Ann. § 598A.010, et seq.

246.    **New Hampshire:** Defendants have entered into an unlawful agreement in restraint of trade in violation of New Hampshire Revised Statutes § 356:1, et seq. Defendants' combination or conspiracy had the following effects: (1) generic Fluocinonide price competition was restrained, suppressed, and eliminated throughout New Hampshire; (2) generic Fluocinonide prices were raised, fixed, maintained and stabilized at artificially high levels throughout New Hampshire. During the Class Period, Defendants' illegal conduct substantially affected New Hampshire commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of New Hampshire Revised Statutes § 356:1, et seq. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under New Hampshire Revised Statutes § 356:1, et seq.

FILED WITH REDACTIONS – PUBLIC VERSION

247.   **New Mexico:** Defendants have entered into an unlawful agreement in restraint of trade in violation of New Mexico Statutes Annotated § 57-1-1, et seq. Defendants' combination or conspiracy had the following effects: (1) generic Fluocinonide price competition was restrained, suppressed, and eliminated throughout New Mexico; (2) generic Fluocinonide prices were raised, fixed, maintained and stabilized at artificially high levels throughout New Mexico. During the Class Period, Defendants' illegal conduct substantially affected New Mexico commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of New Mexico Stat. Ann. § 57-1-1, et seq. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under New Mexico Stat. Ann. § 57-1-1, et seq.

248.   **New York:** Defendants have entered into an unlawful agreement in restraint of trade in violation of New York General Business Law § 340, et seq. Defendants' combination or conspiracy had the following effects: (1) generic Fluocinonide price competition was restrained, suppressed, and eliminated throughout New York; (2) generic Fluocinonide prices were raised, fixed, maintained and stabilized at artificially high levels throughout New York that were higher than they would have been absent Defendants' illegal acts. During the Class Period, Defendants' illegal conduct substantially affected New York commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of New York General Business Law § 340, et seq. The conduct set forth above is a per se violation of the Act.

Accordingly, Plaintiffs and members of the Damages Class seek all relief available under New York Gen. Bus. Law § 340, et seq.

249.    **North Carolina:** Defendants have entered into an unlawful agreement in restraint of trade in violation of the North Carolina General Statutes § 75-1, et seq. Defendants' combination or conspiracy had the following effects: (1) generic Fluocinonide price competition was restrained, suppressed, and eliminated throughout North Carolina; (2) generic Fluocinonide prices were raised, fixed, maintained and stabilized at artificially high levels throughout North Carolina. During the Class Period, Defendants' illegal conduct substantially affected North Carolina commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of North Carolina Gen. Stat. § 75-1, et seq. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under North Carolina Gen. Stat. § 75-1, et. seq.

250.    **North Dakota:** Defendants have entered into an unlawful agreement in restraint of trade in violation of North Dakota Century Code § 51-08.1-01, et seq. Defendants' combination or conspiracy had the following effects: (1) generic Fluocinonide price competition was restrained, suppressed, and eliminated throughout North Dakota; (2) generic Fluocinonide prices were raised, fixed, maintained and stabilized at artificially high levels throughout North Dakota. During the Class Period, Defendants' illegal conduct had a substantial effect on North Dakota commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade

FILED WITH REDACTIONS – PUBLIC VERSION

in violation of North Dakota Cent. Code § 51-08.1-01, et seq. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under North Dakota Cent. Code § 51-08.1-01, et seq.

251.   **Oregon:** Defendants have entered into an unlawful agreement in restraint of trade in violation of Oregon Revised Statutes § 646.705, et seq. Defendants' combination or conspiracy had the following effects: (1) generic Fluocinonide price competition was restrained, suppressed, and eliminated throughout Oregon; (2) generic Fluocinonide prices were raised, fixed, maintained and stabilized at artificially high levels throughout Oregon. During the Class Period, Defendants' illegal conduct had a substantial effect on Oregon commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of Oregon Revised Statutes § 646.705, et seq. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Oregon Revised Statutes § 646.705, et seq.

252.   **Rhode Island:** Defendants have entered into an unlawful agreement in restraint of trade in violation of the Rhode Island Antitrust Act, Rhode Island General Laws § 6-36-1, et seq. Defendants' combination or conspiracy had the following effects: (1) generic Fluocinonide price competition was restrained, suppressed, and eliminated throughout Rhode Island; (2) generic Fluocinonide prices were raised, fixed, maintained and stabilized at artificially high levels throughout Rhode Island. During the Class Period, Defendants' illegal conduct had a substantial effect on Rhode Island commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property on or after July 15, 2013, and are threatened with further injury. By reason of the

foregoing, Defendants have entered into an agreement in restraint of trade in violation of Rhode Island General Laws § 6-36-1, et seq. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Rhode Island General Laws § 6-36-1, et seq.

253.    **South Dakota:** Defendants have entered into an unlawful agreement in restraint of trade in violation of South Dakota Codified Laws § 37-1-3.1, et seq. Defendants' combination or conspiracy had the following effects: (1) generic Fluocinonide price competition was restrained, suppressed, and eliminated throughout South Dakota; (2) generic Fluocinonide prices were raised, fixed, maintained and stabilized at artificially high levels throughout South Dakota. During the Class Period, Defendants' illegal conduct had a substantial effect on South Dakota commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of South Dakota Codified Laws Ann. § 37-1-3.1, et seq. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under South Dakota Codified Laws Ann. § 37-1-3.1, et seq.

254.    **Tennessee:** Defendants have entered into an unlawful agreement in restraint of trade in violation of Tennessee Code Annotated § 47-25-101, et seq. Defendants' combination or conspiracy had the following effects: (1) generic Fluocinonide price competition was restrained, suppressed, and eliminated throughout Tennessee; (2) generic Fluocinonide prices were raised, fixed, maintained and stabilized at artificially high levels throughout Tennessee. During the Class Period, Defendants' illegal conduct had a substantial effect on Tennessee commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By

reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of Tennessee Code Ann. § 47-25-101, et seq. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Tennessee Code Ann. § 47-25-101, et seq.

255.    **Utah:** Defendants have entered into an unlawful agreement in restraint of trade in violation of Utah Code Annotated § 76-10-3101, et seq. Defendants' combination or conspiracy had the following effects: (1) generic Fluocinonide price competition was restrained, suppressed, and eliminated throughout Utah; (2) generic Fluocinonide prices were raised, fixed, maintained and stabilized at artificially high levels throughout Utah. During the Class Period, Defendants' illegal conduct had a substantial effect on Utah commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of Utah Code Annotated § 76-10-3101, et seq. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Utah Code Annotated § 76-10-3101, et seq.

256.    **Vermont:** Defendants have entered into an unlawful agreement in restraint of trade in violation of Vermont Stat. Ann. 9 § 2453, et seq. Defendants' combination or conspiracy had the following effects: (1) generic Fluocinonide price competition was restrained, suppressed, and eliminated throughout Vermont; (2) generic Fluocinonide prices were raised, fixed, maintained and stabilized at artificially high levels throughout Vermont. During the Class Period, Defendants' illegal conduct had a substantial effect on Vermont commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of Vermont Stat. Ann.

FILED WITH REDACTIONS – PUBLIC VERSION

9 § 2453, et seq. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Vermont Stat. Ann. 9 § 2453, et seq.

257.    **West Virginia:** Defendants have entered into an unlawful agreement in restraint of trade in violation of West Virginia Code § 47-18-1, et seq. Defendants' anticompetitive acts described above were knowing, willful, and constitute violations or flagrant violations of West Virginia Antitrust Act. Defendants' combination or conspiracy had the following effects: (1) generic Fluocinonide price competition was restrained, suppressed, and eliminated throughout West Virginia; (2) generic Fluocinonide prices were raised, fixed, maintained and stabilized at artificially high levels throughout West Virginia. During the Class Period, Defendants' illegal conduct had a substantial effect on West Virginia commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of West Virginia Code § 47-18-1, et seq. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under West Virginia Code § 47-18-1, et seq.

258.    **Wisconsin:** Defendants have entered into an unlawful agreement in restraint of trade in violation of the Wisconsin Statutes § 133.01, et seq. Defendants' and their co-conspirators' anticompetitive activities have directly, foreseeably and proximately caused injury to Plaintiffs and members of the Classes in the United States. Specifically, Defendants' combination or conspiracy had the following effects: (1) generic Fluocinonide price competition was restrained, suppressed, and eliminated throughout Wisconsin; (2) generic Fluocinonide prices were raised, fixed, maintained and stabilized at artificially high levels throughout Wisconsin. During the Class Period, Defendants' illegal conduct had a substantial effect on the people of Wisconsin and

87

Wisconsin commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of Wisconsin Stat. § 133.01, et seq. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Wisconsin Stat. § 133.01, et seq.

258a. **Connecticut:** Defendants have entered into an unlawful agreement in restraint of trade in violation of Conn. Gen. Stat. § 35-26 and § 35-28. Defendants' combination or conspiracy described above had the following effects during the class period: (1) generic Fluocinonide price competition was restrained, suppressed, and eliminated throughout Connecticut; (2) generic Fluocinonide prices were raised, fixed, maintained and stabilized at artificially high levels throughout Connecticut. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property on or after July 10, 2017, and are threatened with further injury. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Conn. Gen. Stat. § 35-34 and § 35-35. Plaintiffs have provided a copy of this complaint to the Attorney General as required by Conn. Gen. Stat. § 35-37.

258b. **Maryland:** Defendants have "unreasonably restrain[ed] trade" by "contract, combination or conspiracy" in violation of Md. Code, Com. Law § 11-204(a)(1). During the class period, throughout Maryland, Defendants' combination or conspiracy restrained, suppressed, and eliminated price competition for generic Fluocinonide and raised, fixed, maintained, and stabilized generic Fluocinonide prices at artificially high levels. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in

their business and property on or after October 1, 2017, and are threatened with further injury. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Md. Code, Com. Law § 11-209(b).

259.    **As to All Jurisdictions Above:** Plaintiffs and members of the Damages Class in each of the above jurisdictions have been injured in their business and property by reason of Defendants' unlawful combination, contract, conspiracy and agreement. Plaintiffs and members of the Damages Class have paid more for generic Fluocinonide than they otherwise would have paid in the absence of Defendants' unlawful conduct. This injury is of the type the antitrust laws of the above states were designed to prevent and flows from that which makes Defendants' conduct unlawful.

260.    In addition, Defendants have profited significantly from the aforesaid conspiracy. Defendants' profits derived from their anticompetitive conduct come at the expense and detriment of Plaintiffs and members of the Damages Class.

261.    Accordingly, Plaintiffs and members of the Damages Class in each of the above jurisdictions seek damages (including statutory damages where applicable), to be trebled or otherwise increased as permitted by a particular jurisdiction's antitrust law, and costs of suit, including reasonable attorneys' fees, to the extent permitted by the above state laws.

<u>**FOURTH COUNT**</u>

**Violation of State Consumer Protection Statutes**[69]
<u>**(on behalf of Plaintiffs and the Damages Class)**</u>

262.    Plaintiffs incorporate by reference the allegations set forth above as if fully set forth herein.

---

[69] Statutory consumer protection / deceptive trade violations are alleged herein for the following jurisdictions: Alaska, Arkansas, California, Colorado, Delaware, Florida, ~~Georgia,~~

263.    Defendants engaged in unfair competition or unfair, unconscionable, deceptive or fraudulent acts or practices in violation of the state consumer protection and unfair competition statutes listed below.

264.    **Alaska:** Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of Alaska Statute § 45.50.471, *et seq*.  Defendants knowingly agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling, and/or maintaining at non-competitive and artificially inflated levels, the prices at which generic Fluocinonide were sold, distributed, or obtained in Alaska and took efforts to conceal their agreements from Plaintiffs and members of the Damages Class. The aforementioned conduct on the part of Defendants constituted "unconscionable" and "deceptive" acts or practices in violation of Alaska law.  Defendants' unlawful conduct had the following effects: (1) generic Fluocinonide price competition was restrained, suppressed, and eliminated throughout Alaska; (2) generic Fluocinonide prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Alaska. During the Class Period, Defendants' illegal conduct substantially affected Alaska commerce and consumers. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Alaska Stat. § 45.50.471, *et seq*., and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

265.    **Arkansas:** Defendants have knowingly entered into an unlawful agreement in restraint of trade in violation of the Arkansas Code Annotated, § 4-88-101, *et seq*. Defendants knowingly agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling, and/or maintaining at non-competitive and artificially inflated levels, the prices at

---

~~Michigan~~, Minnesota, Nebraska, ~~Nevada~~, New Hampshire, New Jersey, New Mexico, New York, North Carolina, North Dakota, ~~South Carolina~~, South Dakota, ~~West Virginia~~, Wisconsin and the U.S. Virgin Islands.

**FILED WITH REDACTIONS – PUBLIC VERSION**

which generic Fluocinonide were sold, distributed, or obtained in Arkansas and took efforts to conceal their agreements from Plaintiffs and members of the Damages Class. Defendant Teva increased the price of Fluocinonide, a medical supply, by 10% or more during the 30 days following a declaration of a state of emergency in Arkansas, in violation of A.C.A. § 4-88-303 *et seq.*[70] The aforementioned conduct on the part of Defendants constituted "unconscionable" and "deceptive" acts or practices in violation of Arkansas Code Annotated, § 4-88-107(a)(10). Defendants' unlawful conduct had the following effects: (1) generic Fluocinonide price competition was restrained, suppressed, and eliminated throughout Arkansas; (2) generic Fluocinonide prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Arkansas. During the Class Period, Defendants' illegal conduct substantially affected Arkansas commerce and consumers. As a direct and proximate result of the unlawful conduct of Defendants, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Arkansas Code Annotated, § 4-88-107(a)(10) and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

266. **California:** Defendants have engaged in unfair competition or unfair, unconscionable, deceptive or fraudulent acts or practices in violation of California Business and Professions Code § 17200, *et seq*. During the Class Period, Defendants manufactured, marketed, sold, or distributed generic Fluocinonide in California, and committed and continue to commit acts of unfair competition, as defined by § 17200, *et seq*. of the California Business and Professions

---

[70] States of emergency for Arkansas were declared on at least January 3, 2013; January 17, 2014; March 3, 2014; April 28, 2014; and February 18, 2015; and September 8, 2015.

FILED WITH REDACTIONS – PUBLIC VERSION

Code, by engaging in the acts and practices specified above. This claim is instituted pursuant to §§ 17203 and 17204 of the California Business and Professions Code, to obtain restitution from these Defendants for acts, as alleged herein, that violated § 17200 of the California Business and Professions Code, commonly known as the Unfair Competition Law. Defendants' conduct as alleged herein violated § 17200. The acts, omissions, misrepresentations, practices and non-disclosures of Defendants, as alleged herein, constituted a common, continuous, and continuing course of conduct of unfair competition by means of unfair, unlawful, and/or fraudulent business acts or practices within the meaning of California Business and Professions Code §17200, *et seq*., including, but not limited to, the following: (1) the violations of Section 1 of the Sherman Act, as set forth above; (2) the violations of § 16720, *et seq*. of the California Business and Professions Code, set forth above. Defendants' acts, omissions, misrepresentations, practices, and non-disclosures, as described above, whether or not in violation of § 16720, *et seq*. of the California Business and Professions Code, and whether or not concerted or independent acts, are otherwise unfair, unconscionable, unlawful or fraudulent; (3) Defendants' acts or practices are unfair to purchasers of generic Fluocinonide in the State of California within the meaning of § 17200, California Business and Professions Code; and (4) Defendants' acts and practices are fraudulent or deceptive within the meaning of Section 17200 of the California Business and Professions Code. Moreover, Defendants Taro and Teva unlawfully raised prices of Fluocinonide, a medical supply, by more than 10% during the 30 days following a declaration of a state of emergency in California, in violation of the California Penal Code § 396, thereby committing "unlawful" and "unfair" prohibited business practices under § 17200.[71] Plaintiffs and members of the Damages Class are

---

[71] States of Emergency for California were declared on at least August 22, 2012; July 12, 2013; August 22, 2013; August 23, 2013; September 20, 2013; September 30, 2013; October 31, 2013; January 17, 2014; April 29, 2014; May 14, 2014; August 2, 2014; August 24, 2014; September

92

entitled to full restitution and/or disgorgement of all revenues, earnings, profits, compensation, and benefits that have been obtained by Defendants as a result of such business acts or practices. During the Class Period, Defendants' illegal conduct substantially affected California commerce and consumers. The illegal conduct alleged herein is continuing and there is no indication that Defendants will not continue such activity into the future. The unlawful and unfair business practices of Defendants, and each of them, as described above, have caused and continue to cause Plaintiffs and members of the Damages Class to pay supracompetitive and artificially-inflated prices for generic Fluocinonide. Plaintiffs and members of the Damages Class suffered injury in fact and lost money or property as a result of such unfair competition. The conduct of Defendants as alleged in this Complaint violates § 17200 of the California Business and Professions Code. As alleged in this Complaint, Defendants and their co-conspirators have been unjustly enriched as a result of their wrongful conduct and by Defendants' unfair competition. Plaintiffs and members of the Damages Class are accordingly entitled to equitable relief including restitution and/or disgorgement of all revenues, earnings, profits, compensation, and benefits that may have been obtained by Defendants as a result of such business practices, pursuant to the California Business and Professions Code, §§17203 and 17204.

267. **Colorado:** Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of Colorado Consumer Protection Act, Colorado Rev. Stat. § 6-1-101, *et seq*. Defendants engaged in an unfair and deceptive trade practices during the course of their business dealings, which significantly impacted Plaintiffs as

---

17, 2014; December 22, 2014; May 19, 2015; May 20, 2015; July 31, 2015; September 11, 2015; September 13, 2015; December 18, 2015; February 1, 2016; February 19, 2016; April 19, 2016; June 7, 2016; June 24, 2016; July 26, 2016; July 9, 2016; and August 16, 2016.

**FILED WITH REDACTIONS – PUBLIC VERSION**

actual or potential consumers of the Defendants' goods and which caused Plaintiffs to suffer injury. Defendants took efforts to conceal their agreements from Plaintiffs. Defendants' unlawful conduct had the following effects: (1) generic Fluocinonide price competition was restrained, suppressed, and eliminated throughout Colorado; (2) generic Fluocinonide prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Colorado. During the Class Period, Defendants' illegal conduct substantially affected Colorado commerce and consumers. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Colorado Rev. Stat. § 6-1-101, *et seq.*, and, accordingly, Plaintiffs and members of the Class seek all relief available under that statute and as equity demands.

268.     **Delaware:** Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Delaware Consumer Fraud Act, 6 Del. Code § 2511, *et seq.*  Defendants agreed to, and did in fact, act in restraint of trade or commerce in Delaware, by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which generic Fluocinonide were sold, distributed, or obtained in Delaware. Defendants deliberately failed to disclose material facts to Plaintiffs and members of the Damages Class concerning Defendants' unlawful activities and artificially inflated prices for generic Fluocinonide. Defendants misrepresented to all purchasers during the Class Period that Defendants' generic Fluocinonide prices were competitive and fair. Defendants' unlawful conduct had the following effects: (1) generic Fluocinonide price competition was restrained, suppressed, and eliminated throughout Delaware; (2) generic Fluocinonide prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Delaware. During the Class Period, Defendants' illegal conduct had a substantial effect on Delaware commerce and consumers. As a direct and proximate result of Defendants' violations of law, Plaintiffs and members of the

Damages Class suffered an ascertainable loss of money or property as a result of Defendants' use or employment of unconscionable and deceptive commercial practices as set forth above. That loss was caused by Defendants' willful and deceptive conduct, as described herein. Defendants' deception, including their affirmative misrepresentations and omissions concerning the price of generic Fluocinonide, likely misled all purchasers acting reasonably under the circumstances to believe that they were purchasing generic Fluocinonide at prices set by a free and fair market. Defendants' misleading conduct and unconscionable activities constitute violations of 6 Del. Code § 2511, *et seq.*, and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

269.    **Florida:** Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. § 501.201, *et seq*. Defendants' unlawful conduct had the following effects: (1) generic Fluocinonide price competition was restrained, suppressed, and eliminated throughout Florida; (2) generic Fluocinonide prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Florida. During the Class Period, Defendants' illegal conduct substantially affected Florida commerce and consumers. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Florida Stat. § 501.201, *et seq*., and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

270.    **Georgia:** Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Georgia Uniform Deceptive Trade Practices Act, Georgia Code § 10-1-370, *et seq*.  Defendants agreed to, and did in fact, act in restraint of trade or commerce in Georgia, by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which generic Fluocinonide were sold,

Case 2:16-FL-27243-CMR Document 44 Filed 04/01/19 Page 99 of 120

distributed, or obtained in Georgia. Defendants deliberately failed to disclose material facts to Plaintiffs and members of the Damages Class concerning Defendants' unlawful activities and artificially inflated prices for generic Fluocinonide. Defendants misrepresented to all purchasers during the Class Period that Defendants' generic Fluocinonide prices were competitive and fair. Defendants' unlawful conduct had the following effects: (1) generic Fluocinonide price competition was restrained, suppressed, and eliminated throughout Georgia; (2) generic Fluocinonide prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Georgia. During the Class Period, Defendants' illegal conduct had a substantial effect on Georgia commerce and consumers. As a direct and proximate result of Defendants' violations of law, Plaintiffs and members of the Damages Class suffered an ascertainable loss of money or property as a result of Defendants' use or employment of unconscionable and deceptive commercial practices as set forth above and are threatened with further injury. That loss was caused by Defendants' willful and deceptive conduct, as described herein. Defendants' deception, including their affirmative misrepresentations and omissions concerning the price of generic Fluocinonide, likely misled all purchasers acting reasonably under the circumstances to believe that they were purchasing generic Fluocinonide at prices set by a free and fair market. Defendants' misleading conduct and unconscionable activities constitute violations of Georgia Code § 10-1-370, *et seq.*, and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute and as equity demands.[72]

271. **Michigan:** Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Michigan Consumer Protection

_____

[72] Plaintiffs acknowledge that this claim was dismissed with prejudice by the Court's February 15, 2019 Order (16-md-2724 Dkt. 858) and reassert the claim here solely for purposes of preservation for appeal.

96
**FILED WITH REDACTIONS – PUBLIC VERSION**

Statute, Mich. Compiled Laws § 445.903, *et seq.* Defendants agreed to, and did in fact, act in restraint of trade or commerce in Michigan, by affecting, fixing, controlling, and/or maintaining, at artificial and non competitive levels, the prices at which generic Fluocinonide were sold, distributed, or obtained in Michigan. Defendants deliberately failed to disclose material facts to Plaintiffs and members of the Damages Class concerning Defendants' unlawful activities and artificially inflated prices for generic Fluocinonide. Defendants misrepresented to all purchasers during the Class Period that Defendants' generic Fluocinonide prices were competitive and fair. Defendants' unlawful conduct had the following effects: (1) generic Fluocinonide price competition was restrained, suppressed, and eliminated throughout Michigan; (2) generic Fluocinonide prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Michigan. During the Class Period, Defendants' illegal conduct had a substantial effect on Michigan commerce and consumers. As a direct and proximate result of Defendants' violations of law, Plaintiffs and members of the Damages Class suffered an ascertainable loss of money or property as a result of Defendants' use or employment of unconscionable and deceptive commercial practices as set forth above. That loss was caused by Defendants' willful and deceptive conduct, as described herein. Defendants' deception, including their affirmative misrepresentations and omissions concerning the price of generic Fluocinonide, likely misled all purchasers acting reasonably under the circumstances to believe that they were purchasing generic Fluocinonide at prices set by a free and fair market. Defendants' misleading conduct and unconscionable activities constitute violations of Mich. Compiled Laws § 445.903, *et seq.*, and,

97

FILED WITH REDACTIONS – PUBLIC VERSION

~~accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.~~

272.     **Minnesota:** Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Minnesota Uniform Deceptive Trade Practices Act, Minn. Stat. § 325D.43, *et seq.* Defendants engaged in an unfair and deceptive trade practices during the course of their business dealings, which significantly impacted Plaintiffs as actual or potential consumers of the Defendants' goods and which caused Plaintiffs to suffer injury. Defendants took efforts to conceal their agreements from Plaintiffs. Defendants' unlawful conduct had the following effects: (1) generic Fluocinonide price competition was restrained, suppressed, and eliminated throughout Minnesota; (2) generic Fluocinonide prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Minnesota. During the Class Period, Defendants' illegal conduct substantially affected Minnesota commerce and consumers. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Minn. Stat. § 325D.43, *et seq.*, and, accordingly, Plaintiffs and members of the Class seek all relief available under that statute and as equity demands.

273.     **Nebraska:** Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Nebraska Consumer Protection Act, Neb. Rev. Stat. § 59-1601, *et seq.* Defendants' unlawful conduct had the following effects: (1) generic Fluocinonide price competition was restrained, suppressed, and eliminated throughout Nebraska; (2) generic Fluocinonide prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Nebraska. During the Class Period, Defendants marketed, sold, or distributed generic Fluocinonide in Nebraska, and Defendants' illegal conduct substantially affected Nebraska commerce and consumers. Defendants have engaged in unfair competition or

**FILED WITH REDACTIONS – PUBLIC VERSION**

unfair or deceptive acts or practices in violation of Neb. Rev. Stat. § 59-1601, *et seq*., and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

274. **Nevada:** ~~Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Nevada Deceptive Trade Practices Act, Nev. Rev. Stat. § 598.0903, *et seq*. Defendants agreed to, and did in fact, act in restraint of trade or commerce in Nevada, by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which generic Fluocinonide were sold, distributed, or obtained in Nevada. Defendants deliberately failed to disclose material facts to Plaintiffs and members of the Damages Class concerning Defendants' unlawful activities and artificially inflated prices for generic Fluocinonide. Defendants misrepresented to all purchasers during the Class Period that Defendants' generic Fluocinonide prices were competitive and fair. Defendants' unlawful conduct had the following effects: (1) generic Fluocinonide price competition was restrained, suppressed, and eliminated throughout Nevada; (2) generic Fluocinonide prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Nevada. During the Class Period, Defendants' illegal conduct had a substantial effect on Nevada commerce and consumers. As a direct and proximate result of Defendants' violations of law, Plaintiffs and members of the Damages Class suffered an ascertainable loss of money or property as a result of Defendants' use or employment of unconscionable and deceptive commercial practices as set forth above. That loss was caused by Defendants' willful and deceptive conduct, as described herein. Defendants' deception, including their affirmative misrepresentations and omissions concerning the price of generic Fluocinonide, likely misled all purchasers acting reasonably under the circumstances to believe that they were purchasing generic Fluocinonide at prices set by a free and fair market. Defendants' misleading~~

99

~~conduct and unconscionable activities constitute violations of Nev. Rev. Stat. § 598.0903, *et seq.*,~~

~~and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that~~

~~statute.~~

275.   **New Hampshire:** Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the New Hampshire Consumer Protection Act, N.H. Rev. Stat. § 358-A:1, *et seq.*  Defendants' unlawful conduct had the following effects: (1) generic Fluocinonide price competition was restrained, suppressed, and eliminated throughout New Hampshire; (2) generic Fluocinonide prices were raised, fixed, maintained, and stabilized at artificially high levels throughout New Hampshire. During the Class Period, Defendants marketed, sold, or distributed generic Fluocinonide in New Hampshire, and Defendants' illegal conduct substantially affected New Hampshire commerce and consumers. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of N.H. Rev. Stat. § 358-A:1, *et seq.*, and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

276.   **New Jersey:** Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the New Jersey Consumer Fraud Act, N.J. Statutes § 56:8-1, *et seq.*  Defendants agreed to, and did in fact, act in restraint of trade or commerce in New Jersey, by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which generic Fluocinonide were sold, distributed, or obtained in New Jersey. Defendants deliberately failed to disclose material facts to Plaintiffs and members of the Damages Class concerning Defendants' unlawful activities and artificially inflated prices for generic Fluocinonide. Defendants misrepresented to all purchasers during the Class

Period that Defendants' generic Fluocinonide prices were competitive and fair. Defendant Teva raised the price of Fluocinonide, which is "used to preserve, protect, or sustain the life, health, safety or comfort of persons," by more than 10% within 30 days of the termination of a state of emergency in New Jersey, in violation of N.J. Statutes § 56:8-107 *et seq.*[73] Defendants' unlawful conduct had the following effects: (1) generic Fluocinonide price competition was restrained, suppressed, and eliminated throughout New Jersey; (2) generic Fluocinonide prices were raised, fixed, maintained, and stabilized at artificially high levels throughout New Jersey. During the Class Period, Defendants' illegal conduct had a substantial effect on New Jersey commerce and consumers. As a direct and proximate result of Defendants' violations of law, Plaintiffs and members of the Damages Class suffered an ascertainable loss of money or property as a result of Defendants' use or employment of unconscionable and deceptive commercial practices as set forth above. That loss was caused by Defendants' willful and deceptive conduct, as described herein. Defendants' deception, including their affirmative misrepresentations and omissions concerning the price of generic Fluocinonide, likely misled all purchasers acting reasonably under the circumstances to believe that they were purchasing generic Fluocinonide at prices set by a free and fair market. Defendants' misleading conduct and unconscionable activities constitute violations of N.J. Statutes § 56:8-1, *et seq.*, and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

277. **New Mexico:** Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the New Mexico Stat. § 57-12-1, *et*

---

[73] States of emergency for New Jersey were declared on at least October 27, 2012; October 28, 2012; January 2, 2013; January 21, 2014; November 26, 2014; December 23, 2014; January 26, 2015; March 4, 2015; and January 22, 2016.

FILED WITH REDACTIONS – PUBLIC VERSION

*seq*. Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining at non-competitive and artificially inflated levels, the prices at which generic Fluocinonide were sold, distributed or obtained in New Mexico and took efforts to conceal their agreements from Plaintiffs and members of the Damages Class. The aforementioned conduct on the part of Defendants constituted "unconscionable trade practices," in violation of N.M.S.A. Stat. § 57-12-3, in that such conduct, *inter alia*, resulted in a gross disparity between the value received by Plaintiffs and members of the Damages Class and the prices paid by them for generic Fluocinonide as set forth in N.M.S.A., § 57-12-2E. Plaintiffs and members of the Damages Class were not aware of Defendants' price-fixing conspiracy and were therefore unaware that they were being unfairly and illegally overcharged. Defendants had the sole power to set that price, and Plaintiffs and members of the Damages Class had no power to negotiate a lower price. Moreover, Plaintiffs and members of the Damages Class lacked any meaningful choice in purchasing generic Fluocinonide because they were unaware of the unlawful overcharge, and there was no alternative source of supply through which Plaintiffs and members of the Damages Class could avoid the overcharges. Defendants' conduct with regard to sales of generic Fluocinonide, including their illegal conspiracy to secretly fix the price of generic Fluocinonide at supracompetitive levels and overcharge consumers, was substantively unconscionable because it was one-sided and unfairly benefited Defendants at the expense of Plaintiffs and the public. Defendants took grossly unfair advantage of Plaintiffs and members of the Damages Class. The suppression of competition that has resulted from Defendants' conspiracy has ultimately resulted in unconscionably higher prices for consumers so that there was a gross disparity between the price paid and the value received for generic Fluocinonide. Defendants' unlawful conduct had the following effects: (1) generic Fluocinonide price competition was restrained, suppressed, and eliminated throughout New

FILED WITH REDACTIONS – PUBLIC VERSION

Mexico; (2) generic Fluocinonide prices were raised, fixed, maintained, and stabilized at artificially high levels throughout New Mexico. During the Class Period, Defendants' illegal conduct substantially affected New Mexico commerce and consumers. As a direct and proximate result of the unlawful conduct of Defendants, Plaintiffs and members of the Damages Class have been injured and are threatened with further injury. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of New Mexico Stat. § 57-12-1, *et seq*., and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

278.   **New York:** Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of N.Y. Gen. Bus. Law § 349, *et seq*. Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining, at artificial and non-competitive levels, the prices at which generic Fluocinonide were sold, distributed or obtained in New York and took efforts to conceal their agreements from Plaintiffs and members of the Damages Class. Defendants and their co-conspirators made public statements about the prices of generic Fluocinonide that either omitted material information that rendered the statements that they made materially misleading or affirmatively misrepresented the real cause of price increases for generic Fluocinonide; and Defendants alone possessed material information that was relevant to consumers, but failed to provide the information. Because of Defendants' unlawful trade practices in the State of New York, New York class members who indirectly purchased generic Fluocinonide were misled to believe that they were paying a fair price for generic Fluocinonide or the price increases for generic Fluocinonide were for valid business reasons; and similarly situated consumers were affected by Defendants' conspiracy. Defendants knew that their unlawful trade practices with respect to

pricing generic Fluocinonide would have an impact on New York consumers and not just Defendants' direct customers. Defendants knew that their unlawful trade practices with respect to pricing generic Fluocinonide would have a broad impact, causing consumer class members who indirectly purchased generic Fluocinonide to be injured by paying more for generic Fluocinonide than they would have paid in the absence of Defendants' unlawful trade acts and practices. The conduct of Defendants described herein constitutes consumer-oriented deceptive acts or practices within the meaning of N.Y. Gen. Bus. Law § 349, which resulted in consumer injury and broad adverse impact on the public at large, and harmed the public interest of consumers in New York State in an honest marketplace in which economic activity is conducted in a competitive manner. Defendants' unlawful conduct had the following effects: (1) generic Fluocinonide price competition was restrained, suppressed, and eliminated throughout New York; (2) generic Fluocinonide prices were raised, fixed, maintained, and stabilized at artificially high levels throughout New York. During the Class Period, Defendants marketed, sold, or distributed generic Fluocinonide in New York, and Defendants' illegal conduct substantially affected New York commerce and consumers. During the Class Period, each of Defendants named herein, directly, or indirectly and through affiliates they dominated and controlled, manufactured, sold and/or distributed generic Fluocinonide in New York. Plaintiffs and members of the Damages Class seek all relief available pursuant to N.Y. Gen. Bus. Law § 349(h).

279.   **North Carolina:** Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of North Carolina Gen. Stat. § 75-1.1, *et seq*. Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining, at artificial and non-competitive levels, the prices at which generic Fluocinonide were sold, distributed or obtained in North Carolina and took efforts to

conceal their agreements from Plaintiffs and members of the Damages Class. Defendants' price-fixing conspiracy could not have succeeded absent deceptive conduct by Defendants to cover up their illegal acts. Secrecy was integral to the formation, implementation and maintenance of Defendants' price-fixing conspiracy. Defendants committed inherently deceptive and self-concealing actions, of which Plaintiffs and members of the Damages Class could not possibly have been aware. Defendants and their co-conspirators publicly provided pretextual and false justifications regarding their price increases. Defendants' public statements concerning the price of generic Fluocinonide created the illusion of competitive pricing controlled by market forces rather than supracompetitive pricing driven by Defendants' illegal conspiracy. Moreover, Defendants deceptively concealed their unlawful activities by mutually agreeing not to divulge the existence of the conspiracy to outsiders. Defendants Taro and Teva charged "unreasonably excessive" prices for Fluocinonide, which is a good "consumed or used to preserve, protect, or sustain life, health, safety, or economic well-being of persons or their property," in the 45 days following a declaration of a state of emergency by the Governor, in violation of North Carolina. Gen..Stat. § 75-38 and § 75-1.1.[74] The conduct of Defendants described herein constitutes consumer-oriented deceptive acts or practices within the meaning of North Carolina law, which resulted in consumer injury and broad adverse impact on the public at large, and harmed the public interest of North Carolina consumers in an honest marketplace in which economic activity is conducted in a competitive manner. Defendants' unlawful conduct had the following effects: (1) generic Fluocinonide price competition was restrained, suppressed, and eliminated throughout

---

[74] States of Emergency for North Carolina were declared on at least October 29, 2012; March 12, 2013; June 14, 2013; September 12, 2013; January 28, 2014; February 11, 2014; April 28, 2014; July 2, 2014; January 26, 2015; February 16, 2015; February 25, 2015; October 1, 2015; January 20, 2016; and February 17, 2016.

**FILED WITH REDACTIONS – PUBLIC VERSION**

North Carolina; (2) generic Fluocinonide prices were raised, fixed, maintained, and stabilized at artificially high levels throughout North Carolina. During the Class Period, Defendants marketed, sold, or distributed generic Fluocinonide in North Carolina, and Defendants' illegal conduct substantially affected North Carolina commerce and consumers. During the Class Period, each of Defendants named herein, directly, or indirectly and through affiliates they dominated and controlled, manufactured, sold and/or distributed generic Fluocinonide in North Carolina. Plaintiffs and members of the Damages Class seek actual damages for their injuries caused by these violations in an amount to be determined at trial and are threatened with further injury. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of North Carolina Gen. Stat. § 75-1.1, *et seq*., and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

280.   **North Dakota:** Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the North Dakota Unlawful Sales or Advertising Practices Statute, N.D. Century Code § 51-15-01, *et seq*.  Defendants agreed to, and did in fact, act in restraint of trade or commerce in North Dakota, by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which generic Fluocinonide were sold, distributed, or obtained in North Dakota. Defendants deliberately failed to disclose material facts to Plaintiffs and members of the Damages Class concerning Defendants' unlawful activities and artificially inflated prices for generic Fluocinonide. Defendants misrepresented to all purchasers during the Class Period that Defendants' generic Fluocinonide prices were competitive and fair. Defendants' unlawful conduct had the following effects: (1) generic Fluocinonide price competition was restrained, suppressed, and eliminated throughout North Dakota; (2) generic Fluocinonide prices were raised, fixed, maintained, and stabilized at

artificially high levels throughout North Dakota. During the Class Period, Defendants' illegal conduct had a substantial effect on North Dakota commerce and consumers. As a direct and proximate result of Defendants' violations of law, Plaintiffs and members of the Damages Class suffered an ascertainable loss of money or property as a result of Defendants' use or employment of unconscionable and deceptive commercial practices as set forth above. That loss was caused by Defendants' willful and deceptive conduct, as described herein. Defendants' deception, including their affirmative misrepresentations and omissions concerning the price of generic Fluocinonide, likely misled all purchasers acting reasonably under the circumstances to believe that they were purchasing generic Fluocinonide at prices set by a free and fair market. Defendants' misleading conduct and unconscionable activities constitute violations of N.D. Century Code § 51-15-01, *et seq*., and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

281. **South Carolina:** Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of South Carolina Unfair Trade Practices Act, S.C. Code Ann. § 39-5-10, *et seq*. Defendants' combination or conspiracy had the following effects: (1) generic Fluocinonide price competition was restrained, suppressed, and eliminated throughout South Carolina; (2) generic Fluocinonide prices were raised, fixed, maintained, and stabilized at artificially high levels throughout South Carolina. During the Class Period, Defendants' illegal conduct had a substantial effect on South Carolina commerce and consumers. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. Defendants have engaged in unfair competition or unfair or deceptive acts or

~~practices in violation of S.C. Code Ann. § 39-5-10, *et seq*., and, accordingly, Plaintiffs and the members of the Damages Class seek all relief available under that statute.~~[75]

282.    **South Dakota:** Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the South Dakota Deceptive Trade Practices and Consumer Protection Statute, S.D. Codified Laws § 37-24-1, *et seq*.  Defendants agreed to, and did in fact, act in restraint of trade or commerce in South Dakota, by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which generic Fluocinonide were sold, distributed, or obtained in South Dakota. Defendants deliberately failed to disclose material facts to Plaintiffs and members of the Damages Class concerning Defendants' unlawful activities and artificially inflated prices for generic Fluocinonide. Defendants misrepresented to all purchasers during the Class Period that Defendants' generic Fluocinonide prices were competitive and fair. Defendants' unlawful conduct had the following effects: (1) generic Fluocinonide price competition was restrained, suppressed, and eliminated throughout South Dakota; (2) generic Fluocinonide prices were raised, fixed, maintained, and stabilized at artificially high levels throughout South Dakota. Defendants' illegal conduct substantially affected South Dakota commerce and consumers. As a direct and proximate result of Defendants' violations of law, Plaintiffs and members of the Damages Class suffered an ascertainable loss of money or property as a result of Defendants' use or employment of unconscionable and deceptive commercial practices as set forth above. That loss was caused by Defendants' willful and deceptive conduct, as described herein. Defendants' deception, including their affirmative misrepresentations and omissions concerning the price of generic Fluocinonide,

---

[75] Plaintiffs acknowledge that this claim was dismissed with prejudice by the Court's February 15, 2019 Order (16-md-2724 Dkt. 858) and reassert the claim here solely for purposes of preservation for appeal.

**FILED WITH REDACTIONS – PUBLIC VERSION**

likely misled all purchasers acting reasonably under the circumstances to believe that they were purchasing generic Fluocinonide at prices set by a free and fair market. Defendants' affirmative misrepresentations and omissions constitute information important to Plaintiffs and members of the Damages Class as they related to the cost of generic Fluocinonide they purchased. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of S.D. Codified Laws § 37-24-1, *et seq*., and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

~~283.   **West Virginia:** Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the West Virginia Consumer Credit and Protection Act, W.Va. Code § 46A-6-101, *et seq*. Defendants agreed to, and did in fact, act in restraint of trade or commerce in a market that includes West Virginia, by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which generic Fluocinonide were sold, distributed, or obtained in West Virginia. Defendants deliberately failed to disclose material facts to Plaintiffs and members of the Damages Class concerning Defendants' unlawful activities and artificially inflated prices for generic Fluocinonide. Defendants affirmatively misrepresented to all purchasers during the Class Period that Defendants' generic Fluocinonide prices were competitive and fair. Defendants' unlawful conduct had the following effects: (1) generic Fluocinonide price competition was restrained, suppressed, and eliminated throughout West Virginia; (2) generic Fluocinonide prices were raised, fixed, maintained, and stabilized at artificially high levels throughout West Virginia. Defendants' illegal conduct substantially affected West Virginia commerce and consumers. As a direct and proximate result of Defendants' violations of law, Plaintiffs and members of the Damages Class suffered an ascertainable loss of money or property as a result of Defendants' use or employment of~~

~~unconscionable and deceptive commercial practices as set forth above. That loss was caused by~~
~~Defendants' willful and deceptive conduct, as described herein. Defendants' deception, including~~
~~their affirmative misrepresentations and omissions concerning the price of generic Fluocinonide,~~
~~likely misled all purchasers acting reasonably under the circumstances to believe that they were~~
~~purchasing generic Fluocinonide at prices set by a free and fair market. Defendants' affirmative~~
~~misrepresentations and omissions constitute information important to Plaintiffs and members of~~
~~the Damages Class as they related to the cost of generic Fluocinonide they purchased. Defendants~~
~~have engaged in unfair competition or unfair or deceptive acts or practices in violation of W.Va.~~
~~Code § 46A-6-101, *et seq.*, and, accordingly, Plaintiffs and members of the Damages Class seek~~
~~all relief available under that statute.~~[76]

284.   **Wisconsin:** Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Wisconsin Consumer Protection Statutes, Wisc. Stat. § 100.18, *et seq*.  Defendants agreed to, and did in fact, act in restraint of trade or commerce in a market that includes Wisconsin, by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which generic Fluocinonide were sold, distributed, or obtained in Wisconsin. Defendants affirmatively misrepresented to all purchasers during the Class Period that Defendants' generic Fluocinonide prices were competitive and fair. Defendants' unlawful conduct had the following effects: (1) generic Fluocinonide price competition was restrained, suppressed, and eliminated throughout Wisconsin; (2) generic Fluocinonide prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Wisconsin. Defendants' illegal conduct substantially affected Wisconsin commerce

---

[76] Plaintiffs acknowledge that this claim was dismissed with prejudice by the Court's February 15, 2019 Order (16-md-2724 Dkt. 858) and reassert the claim here solely for purposes of preservation for appeal.

FILED WITH REDACTIONS – PUBLIC VERSION

and consumers. As a direct and proximate result of Defendants' violations of law, Plaintiffs and members of the Damages Class suffered an ascertainable loss of money or property as a result of Defendants' use or employment of unconscionable and deceptive commercial practices as set forth above. That loss was caused by Defendants' willful and deceptive conduct, as described herein. Defendants' deception, including their affirmative misrepresentations concerning the price of generic Fluocinonide, likely misled all purchasers acting reasonably under the circumstances to believe that they were purchasing generic Fluocinonide at prices set by a free and fair market. Defendants' affirmative misrepresentations constitute information important to Plaintiffs and members of the Damages Class as they related to the cost of generic Fluocinonide they purchased. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Wisc. Stat. § 100.18, *et seq*., and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

285.   **U.S. Virgin Islands:** Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the U.S. Virgin Islands Consumer Fraud and Deceptive Business Practices Act, 12A V.I.C. §§ 102, 301-35, *et seq*.  Defendants agreed to, and did in fact, act in restraint of trade or commerce in a market that includes U.S.V.I., by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which generic Fluocinonide were sold, distributed, or obtained in U.S.V.I. Defendants deliberately failed to disclose material facts to Plaintiffs and members of the Damages Class concerning Defendants' unlawful activities and artificially inflated prices for generic Fluocinonide. Defendants affirmatively misrepresented to all purchasers during the Class Period that Defendants' generic Fluocinonide prices were competitive and fair. Defendants' unlawful conduct had the following effects: (1) generic Fluocinonide price competition was restrained,

suppressed, and eliminated throughout U.S.V.I.; (2) generic Fluocinonide prices were raised, fixed, maintained, and stabilized at artificially high levels throughout U.S.V.I.. Defendants' illegal conduct substantially affected U.S.V.I. commerce and consumers. As a direct and proximate result of Defendants' violations of law, Plaintiffs and members of the Damages Class suffered an ascertainable loss of money or property as a result of Defendants' use or employment of unconscionable and deceptive commercial practices as set forth above and are threatened with further injury. That loss was caused by Defendants' willful and deceptive conduct, as described herein. Defendants' deception, including their affirmative misrepresentations and omissions concerning the price of generic Fluocinonide, likely misled all purchasers acting reasonably under the circumstances to believe that they were purchasing generic Fluocinonide at prices set by a free and fair market. Defendants' affirmative misrepresentations and omissions constitute information important to Plaintiffs and members of the Damages Class as they related to the cost of generic Fluocinonide they purchased. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of 12A V.I.C. §§ 102, 301-35, *et seq*., and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute and as equity demands.

## **FIFTH COUNT**

### **Unjust Enrichment[77]**
### **(on behalf of Plaintiffs and the Damages Class)**

286.     Plaintiffs incorporate by reference the allegations set forth above as if fully set forth herein.

---

[77] Unjust enrichment claims are alleged herein under the laws of Alabama, Alaska, Arizona, Arkansas, California, Colorado, Delaware, Florida, Georgia, Idaho, Illinois, Iowa, Kansas, Louisiana, Maine, Maryland, Massachusetts, Michigan, Minnesota, Mississippi, Missouri, Montana, Nebraska, Nevada, New Hampshire, New Jersey, New Mexico, New York,

FILED WITH REDACTIONS – PUBLIC VERSION

287.    To the extent required, this claim is pleaded in the alternative to the other claims in this Complaint. This claim is brought under the equity precedents of each of the IRP Damages Jurisdictions.

288.    Defendants have unlawfully benefited from their sales of generic Fluocinonide because of the unlawful and inequitable acts alleged in this Complaint. Defendants unlawfully overcharged privately held pharmacies, who purchased generic Fluocinonide at prices that were more than they would have been but for Defendants' unlawful actions.

289.    Defendants' financial benefits resulting from their unlawful and inequitable acts are traceable to overpayments by Plaintiffs and members of the Damages Class.

290.    Plaintiffs and the Damages Class have conferred upon Defendants an economic benefit, in the nature of profits resulting from unlawful overcharges, to the economic detriment of Plaintiffs and the Damages Class.

291.    Defendants have been enriched by revenue resulting from unlawful overcharges for generic Fluocinonide while Plaintiffs have been impoverished by the overcharges they paid for generic Fluocinonide imposed through Defendants' unlawful conduct.  Defendants' enrichment and Plaintiffs' impoverishment are connected.

292.    There is no justification for Defendants' retention of, and enrichment from, the benefits they received, which caused impoverishment to Plaintiffs and the Damages Class, because Plaintiffs and the Damages Class paid supracompetitive prices that inured to Defendants' benefit, and it would be inequitable for Defendants to retain any revenue gained from their unlawful overcharges.

---

North Carolina, North Dakota, Oregon, Pennsylvania, Rhode Island, South Carolina, South Dakota, Tennessee, Texas, Utah, Vermont, Virginia, Washington, West Virginia, Wisconsin and Wyoming as well as the District of Columbia, Puerto Rico and the U.S. Virgin Islands.

**FILED WITH REDACTIONS – PUBLIC VERSION**

293.     Plaintiffs did not interfere with Defendants' affairs in any manner that conferred these benefits upon Defendants.

294.     The benefits conferred upon Defendants were not gratuitous, in that they constituted revenue created by unlawful overcharges arising from Defendants' illegal and unfair actions to inflate the prices of generic Fluocinonide.

295.     The benefits conferred upon Defendants are measurable, in that the revenue Defendants have earned due to their unlawful overcharges of generic Fluocinonide are ascertainable by review of sales records.

296.     It would be futile for Plaintiffs and the Damages Class to seek a remedy from any party with whom they have privity of contract. Defendants have paid no consideration to any other person for any of the unlawful benefits they received indirectly from Plaintiffs and the Damages Class with respect to Defendants' sales of generic Fluocinonide.

297.     It would be futile for Plaintiffs and the Damages Class to seek to exhaust any remedy against the immediate intermediary in the chain of distribution from which they indirectly purchased generic Fluocinonide, as the intermediaries are not liable and cannot reasonably be expected to compensate Plaintiffs and the Damages Class for Defendants' unlawful conduct.

298.     The economic benefit of overcharges and monopoly profits derived by Defendants through charging supracompetitive and artificially inflated prices for generic Fluocinonide is a direct and proximate result of Defendants' unlawful practices.

299.     The financial benefits derived by Defendants rightfully belong to Plaintiffs and the Damages Class, because Plaintiffs and the Damages Class paid supracompetitive prices during the Class Period, inuring to the benefit of Defendants.

FILED WITH REDACTIONS – PUBLIC VERSION

300.     It would be inequitable under unjust enrichment principles under the law of the District of Columbia and the laws of all states and territories of the United States, except Ohio and Indiana, for Defendants to be permitted to retain any of the overcharges for generic Fluocinonide derived from Defendants' unlawful, unfair and unconscionable methods, acts, and trade practices alleged in this Complaint.

301.     Defendants are aware of and appreciate the benefits bestowed upon them by Plaintiffs and the Damages Class.  Defendants consciously accepted the benefits and continue to do so as of the date of this filing, as generic Fluocinonide prices remain inflated above pre-conspiracy levels.

302.     Defendants should be compelled to disgorge in a common fund for the benefit of Plaintiffs and the Damages Class all unlawful or inequitable proceeds they received from their sales of generic Fluocinonide.

303.     A constructive trust should be imposed upon all unlawful or inequitable sums received by Defendants traceable to indirect purchases of generic Fluocinonide by Plaintiffs and the Damages Class. Plaintiffs and the Damages Class have no adequate remedy at law.

### XIII.   PRAYER FOR RELIEF

WHEREFORE, Plaintiffs demand judgment for the following relief:

A.     The Court determine that this action may be maintained as a class action under Rule 23(a), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure, and direct that reasonable Notice of this action, as provided by Rule 23(c)(2) of the Federal Rules of Civil Procedure, be given to each and every member of the Class;

B.     That the unlawful conduct, contract, conspiracy, or combination alleged herein be adjudged and decreed: (a) an unreasonable restraint of trade or commerce in violation of Section

115

1 of the Sherman Act; (b) a per se violation of Section 1 of the Sherman Act; (c) an unlawful combination, trust, agreement, understanding and/or concert of action in violation of the state antitrust and unfair competition and consumer protection laws as set forth herein; and (d) acts of unjust enrichment by Defendants as set forth herein.

C.     Plaintiffs and members of the Damages Class recover damages, to the maximum extent allowed under state and federal laws, and that a judgment in favor of Plaintiffs and members of the Damages Class be entered against Defendants jointly and severally in an amount to be trebled to the extent such laws permit;

D.     Plaintiffs and members of the Damages Class recover damages, to the maximum extent allowed by such laws, in the form of restitution and/or disgorgement of profits unlawfully obtained;

E.     Plaintiffs and members of the Damages Class be awarded restitution, including disgorgement of profits Defendants obtained as a result of their acts of unfair competition and acts of unjust enrichment, and the Court establish of a constructive trust consisting of all ill-gotten gains from which Plaintiffs and members of the Damages Class may make claims on a pro rata basis;

F.     Defendants, their affiliates, successors, transferees, assignees and other officers, directors, partners, agents and employees thereof, and all other persons acting or claiming to act on their behalf or in concert with them, be permanently enjoined and restrained from in any manner continuing, maintaining or renewing the conduct, contract, conspiracy, or combination alleged herein, or from entering into any other contract, conspiracy, or combination having a similar purpose or effect, and from adopting or following any practice, plan, program, or device having a similar purpose or effect;

FILED WITH REDACTIONS – PUBLIC VERSION

G.      Plaintiffs and members of the Classes be awarded pre- and post- judgment interest as provided by law, and that such interest be awarded at the highest legal rate;

H.      Plaintiffs and members of the Classes recover their costs of suit, including reasonable attorneys' fees, as provided by law; and

I.      Plaintiffs and members of the Classes have such other and further relief as the case may require and the Court may deem just and proper.

## XIV.   JURY DEMAND

Plaintiffs demand a trial by jury, pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, of all issues so triable.

Dated: April 1, 2019                                 Respectfully submitted,

/s/  Jonathan W. Cuneo

Peter Gil-Montllor                              Jonathan W. Cuneo
Christian Hudson                               Victoria Romanenko
**CUNEO, GILBERT & LADUCA LLP**    **CUNEO, GILBERT & LADUCA LLP**
16 Court Street, Suite 1012                 4725 Wisconsin Ave., NW Suite 200
Brooklyn, NY 11241                          Washington, DC 20016
202-789-3960                                   202-789-3960
pgil-montllor@cuneolaw.com             jonc@cuneolaw.com

*Lead Counsel for the Indirect Reseller Plaintiffs*

117
**FILED WITH REDACTIONS – PUBLIC VERSION**